# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

―――――――――――――

## No. 201600015

―――――――――――――

## UNITED STATES OF AMERICA
Appellee

v.

## JAMES A. HALE III
Staff Sergeant (E-6), U.S. Marine Corps
Appellant

―――――――――――――

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Eugene H. Robinson, Jr., USMC.
Post-trial Article 39(a), UCMJ, Session Military Judge: Colonel James Carberry, USMC.
Convening Authority: Commanding General, Marine Corps Recruit Depot, Western Recruiting Region, San Diego, CA.
Staff Judge Advocate's Recommendation: Major Brett M. Wilson, USMC.
For Appellant: Gary Myers, Esq; Brian A. Pristera, Esq.; Lieutenant Christopher C. McMahon, JAGC, USN; Lieutenant Commander Jeremy J. Wall, JAGC, USN.
For Appellee: Major Cory A. Carver, USMC; Lieutenant Commander Justin C. Henderson, JAGC, USN.

―――――――――――――

Decided 31 May 2017

―――――――――――――

Before GLASER-ALLEN, MARKS, and FULTON, *Appellate Military Judges*

―――――――――――――

## PUBLISHED OPINION OF THE COURT

―――――――――――――

FULTON, Judge:

A general court-martial, consisting of members with enlisted representation, convicted the appellant, contrary to his pleas, of two

Corrected Opinion Released 5 June 2017

specifications of rape and single specifications of violating a general order, adultery, indecent language, wrongful use of a steroid, assault with a dangerous weapon, and kidnapping in violation of Articles 92, 112a, 120, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 912a, 920, 928, and 934. The members sentenced the appellant to 26 years' confinement, reduction to E-1, total forfeiture of pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged.

The appellant raises seven assignments of error:

I.  That the military judge erred by admitting evidence obtained after an unlawful search of the appellant's gym bag;

II. That trial counsel's attempt to intimidate detailed trial defense counsel and improper arguments at trial amounted to prosecutorial misconduct;

III. That the appellant received ineffective assistance from his trial defense counsel, who were laboring under a conflict of interest;

IV. That his sentence to 26 years of confinement is inappropriately severe;

V.  That trial defense counsel initially detailed to the case were ineffective in their representation during the defense counsel's first site visit;

VI. That the appellant was prejudiced when the military judge denied a second site visit for his counsel; and,

VII.  That text messages were improperly admitted during the presentencing case.

We find merit in the appellant's third assignment of error. We find that his representation was adversely affected by a conflict of interest and that his convictions should be set aside under *Cuyler v. Sullivan*.[1]

Separately, we also find that the undisclosed conflicts of interest in this case were stark, corrosive to the fairness of the proceedings, and resistant to a standard prejudice analysis. On the basis of our review of the entire record, we judge that the findings should not be approved.[2]

## I. BACKGROUND

### A. Violation of a lawful general order

In May 2011, the appellant was a staff sergeant in the Marine Corps deployed to Afghanistan. While deployed, he began a sexual relationship with

---

[1] 446 U.S. 335 (1980).

[2] Art. 66(c), UCMJ.

another Marine, resulting in that Marine's pregnancy. The sexual relationship violated I Marine Expeditionary Force (Forward) General Order 1A, prohibiting sexual acts by Marines deployed to Afghanistan.

## B. Assault with a dangerous weapon, rape, adultery, kidnapping, indecent language, and wrongful use of steroids

These offenses arose from an encounter between the appellant and SK, a civilian in Anchorage, Alaska. The government alleged that the appellant contacted SK and asked her to obtain prescription drugs for him. When he thought that he had been shorted in the exchange, he pointed a pistol at SK, drove her to a different part of Anchorage, forced her at gunpoint to perform oral sex on him, and raped her.

SK reported the assault to the Anchorage Police Department the next day. The police used SK's phone records to identify the appellant as a suspect and arrested him at a local gym. Inside the appellant's gym bag, the police found evidence that led to the appellant's conviction for wrongfully using steroids.

## II. ANALYSIS

In his third assignment of error, the appellant alleges that his lead trial defense counsel had a conflict of interest, and that his trial defense counsel were ineffective. This assignment of error is factually related to his claim of prosecutorial misconduct. Because we resolve this case on grounds of ineffective assistance of counsel, we do not reach the issue of prosecutorial misconduct or the other assigned errors. But trial counsel's actions—and defense counsel's responses to them—are relevant to the appellant's ineffective assistance and conflict claims.

The trial defense counsel were Marine Corps judge advocates stationed in Southern California. The appellant was initially represented by two detailed judge advocates: Major RP, the senior defense counsel, and Captain (Capt) KC. The appellant requested Capt JS as individual military counsel. This request was granted and the appellant excused Major RP from further participation in the case. Capt KC became the lead defense counsel, and Capt JS was the assistant defense counsel. The lead trial counsel during the trial was Lieutenant Colonel (LtCol) CT, the Regional Trial Counsel and a recent military judge at Camp Pendleton.

Sometime after Capt KC began representing the appellant, but before the beginning of the trial on the merits, Capt KC's husband, Capt CC, became a trial counsel within LtCol CT's region and LtCol CT became Capt CC's reviewing officer (RO) for fitness report purposes. Capt KC did not inform the appellant that her husband had become a trial counsel or that the lead prosecutor in his case had become her husband's RO. At the time of the

appellant's trial, Capt KC anticipated that she herself would become a trial counsel within the region soon after the appellant's trial. She did not disclose this fact to the appellant, either.

The Sixth Amendment entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms."[3]   Not only is there a right to counsel, but there is also a "correlative right to representation that is free from conflicts of interest."[4]

In assessing an appellant's claim that his counsel were ineffective, appellate courts normally apply the two-pronged test announced in *Strickland v. Washington.*[5] In order to prevail, an appellant must demonstrate that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment. Second, [he] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[6]

When a claim of ineffective assistance of counsel stems from the attorney's conflict of interest, a reviewing court faces distinct analytical challenges. *Strickland* recognized that conflicts of interest strike at the most basic of counsel's duties—the duty of loyalty—and that the prejudice accruing from such a violation is hard to measure.[7] This justifies, according to *Strickland*, an exception to the usual prejudice analysis, substituting a "fairly rigid rule of presumed prejudice for conflicts of interest."[8]

## A. Application of *Cuyler v. Sullivan*

The case cited approvingly by the *Strickland* Court for the proposition that courts should presume prejudice in conflict cases is *Cuyler v. Sullivan.*[9] *Cuyler* looms large in every discussion of counsel conflicts in criminal cases, and rates some discussion here. John Sullivan, the petitioner in *Cuyler*, was one of three defendants accused of murdering the same victim. He accepted

---

[3] *Strickland v. Washington*, 466 U.S. 668, 688 (1984). *See also United States v. Knight*, 53 M.J. 340, 342 (C.A.A.F. 2000) (citing *United States v. Palenius*, 2 M.J. 86 (C.M.A. 1977)).

[4] *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (citations omitted).

[5] 466 U.S. 668 (1984).

[6] *Id*. at 687.

[7] *Id*. at 692.

[8] *Id*.

[9] 446 U.S. 335 (1980).

representation from the same attorney representing the two alleged co-actors. At trial, he did not object to the multiple representation and, since Sullivan was the only defendant at his trial, nothing about the circumstances of the case caused the trial court to inquire into potential conflicts.

After Sullivan was convicted, he attacked his conviction under the rule established by *Holloway v. Arkansas*. In *Holloway*, a trial court required a single public defender to represent three co-defendants in a single trial. The attorney objected, but the trial court did not appoint separate counsel or take adequate steps to ensure conflict-free representation. The Supreme Court had held in *Holloway* that where a trial court wrongly required a defendant to accept multiple representation over his objection, prejudice is presumed. The question in *Cuyler*, then, was whether that same presumption of prejudice applied when the defendant did not object. The Supreme Court held that the petitioner was entitled to a more limited presumption than was the petitioner in *Holloway*. The Court held that where "his counsel actively represented conflicting interests," the petitioner need only show that the conflict "adversely affected his lawyer's performance." Beyond this showing, however, he "need not demonstrate prejudice in order to obtain relief."[10]

After *Cuyler*, courts of appeals applied *Cuyler*'s adverse-effect-on-counsel's-performance test "'unblinkingly' to 'all kinds of alleged attorney ethical conflicts.'"[11] Circuit courts applied the *Cuyler* test not only to conflict cases involving concurrent representation of clients with conflicting interests, but also to conflict cases involving consecutive representation[12] and conflicts between the client and the attorney's own personal interests.[13] Some courts, however, questioned the broad application of the *Cuyler* test to conflict cases not involving concurrent representation of multiple clients, reasoning that not all conflicts of interest risk the same pernicious and hard-to-assess prejudicial effect as concurrent representation cases.[14] In this view, conflicts in which counsel had not "actively represented conflicting interest"—understood here to mean concurrent representation of conflicted clients—were reviewed under *Strickland*'s more onerous second prong, requiring a

---

[10] *Id.* at 349-50.

[11] *Mickens v. Taylor*, 535 U.S. 162, 174 (2002) (quoting *Beets v. Collins¸* 65 F.3d 1258, 1266 (5th Cir. 1995) (en banc)).

[12] *See Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000).

[13] *See United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980).

[14] *See e.g. Beets*, 65 F.3d at 1270.

reasonable probability that counsel's performance affected the outcome of the case.[15]

### 1. The Supreme Court and Mickens v. Taylor

The Supreme Court last took up the applicability of the *Cuyler* standard in its 2002 case *Mickens v. Taylor*.[16] The petitioner, Walter Mickens, was convicted of murdering another man who, at the time of his murder, was represented by the same attorney later appointed to represent Mickens.[17] Not only was Mickens represented by his victim's lawyer, but the case came before the same judge who had been assigned to his victim's case.[18] Counsel did not disclose his prior representation of the victim and even though the trial court had reason to know of the potential conflict, the judge did not inquire into the matter.[19] Then, as a habeas petitioner, Mickens claimed that his counsel had suffered from an unobjected-to conflict of interest, and that the trial court had not inquired into the conflict on the record.[20] Mickens argued that since the trial court had had reason to apprehend the potential conflict, he should be entitled to *Holloway*'s more generous presumption of prejudice and not be required to make any showing that the conflict adversely affected his representation.

The Supreme Court disagreed and applied *Cuyler*'s adverse-effect-on-counsel test. But even as it applied *Cuyler*, the Supreme Court questioned its application to conflicts of interest generally. In dicta, the *Mickens* Court noted that the narrow question before it was whether *Cuyler* required an appellant to demonstrate that a conflict affected his representation when the trial court neglected to inquire into the potential conflict, but should have. The Court questioned the assumption that all ineffective assistance of counsel claims rooted in conflicts of interest should merely be examined for an actual effect on counsel's performance, rather than requiring a showing of probable effect on the outcome of trial under *Strickland*.[21] The Court noted that the conflict in *Cuyler*—unlike the one it faced in *Mickens*—involved the simultaneous representation of multiple criminal defendants. The Court noted that it was this *active representation of conflicting interests* that had

---

[15] *Id.* at 1272-73.

[16] 535 U.S. 162 (2002).

[17] *Id.* at 164-65.

[18] *Id.* at 165.

[19] *Id.* at 164-65.

[20] *Id.* at 164.

[21] *Id.* at 173-75.

necessitated a presumption of prejudice in *Cuyler*.[22] This meant, according to the *Mickens* majority, the concurrent representation of clients with opposing interests. The applicability of *Cuyler*'s limited presumption of prejudice to cases involving successive representation—and, presumably, other types of conflicts–remained "an open question."[23]

*2. Federal circuit courts*

Since *Mickens*, federal circuit courts of appeals have disagreed over the applicability of *Cuyler* to conflict cases not involving concurrent representation. The disagreement comes down to a question of how broadly courts should apply the *Cuyler* holding as interpreted in the following passage from *Strickland*:

> In *Cuyler v. Sullivan* . . . the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."[24]

On one hand, the rationale for *Cuyler*'s limited presumption of prejudice endorsed here by *Strickland* seems straightforward: actual conflicts represent breaches in the basic duty of loyalty owed an accused. And it is this breach of the basic duty of loyalty that makes prejudice difficult to assess and justifies *Cuyler*'s limited presumption of prejudice. In this reading, *Cuyler*'s specific wording requiring that counsel "actively represented conflicting interests" simply reflects the specific circumstances of that case, in which the conflict at issue happened to be one of concurrent multiple representation. What really

---

[22] *Id*. at 175.

[23] *Id*. at 176.

[24] *Strickland*, 466 U.S. at 692 (quoting *Cuyler*, 446 U.S. at 348, 350) (internal citation omitted).

matters is that an actual conflict of interest adversely affected counsel's representation. But if one reads *Cuyler*'s use of the expression "actively represented conflicting interests" as an otherwise unexpressed limitation on *Cuyler*'s application to cases involving concurrent representation of clients with conflicting interests, then cases affected by other kinds of conflicts are left to be tested for prejudice under *Strickland*'s more stringent second prong.

The Fifth[25] and Eighth[26] Circuits had declined to apply *Cuyler* to other types of conflicts even before *Mickens*. In *Beets v. Collins*, the Fifth Circuit Court of Appeals explained that conflicts between counsel's own interests and a client's are "virtually limitless" and "range from wholly benign to devastating."[27] The varied and sometimes vague nature of self-interest-based conflicts and their close relationship with questions of lawyer effectiveness, argued the *Beets* court, make these conflicts different from concurrent representation cases and inappropriate for analysis under *Cuyler*.[28] The *Beets* court found that only in concurrent representation cases do we know that counsel must have breached the fundamental duty of loyalty. Where counsel actively represents multiple clients in the same matter with opposing interests, "the source and consequences of the ethical problems are straightforward: 'counsel represents two clients with competing interests and is torn between two duties. Counsel can properly turn in no direction. He must fail one or do nothing and fail both.'"[29]

Since *Mickens*, the First,[30] Second,[31] Third,[32] Fourth,[33] Seventh,[34] Ninth,[35] and Tenth Circuits[36] have applied *Cuyler*—or a slightly modified version of

---

[25] 65 F.3d 1258, 1270 (5th Cir. 1995).

[26] *See Caban v. United States*, 281 F.3d 778, 781-83 (8th Cir. 2002).

[27] *Beets,* 65 F.3d at 1271 (citations omitted).

[28] *Id.*

[29] *Id.* at 1270 (quoting *Beets v. Collins*, 986 F.2d 1478, 1492 (5th Cir. 1993) (Higginbotham, J., concurring).

[30] *See United States v. Segarra-Rivera*, 473 F.3d 381, 385 (1st Cir. 2007) (addressing conflict between attorney's personal interest and client's interests).

[31] *See LoCascio v. United States*, 395 F.3d 51, 56 (2nd Cir. 2005) (addressing conflict between attorney's personal interest and client's interests).

[32] *See Chester v. Comm'r of Pa. Dep't of Corr.,* 598 Fed. Appx. 94, 105, unpublished op. (3d Cir. 2015) (per curiam) (addressing conflict between attorney's personal interest and client's interests).

[33] *See Rubin v. Gee*, 292 F.3d 396, 406 (4th Cir. 2002) (addressing conflict between attorney's personal interest and client's interests).

it—to conflict cases not involving concurrent representation of conflicted clients. Courts in these circuits continue to adhere to a more purposive understanding of *Cuyler*'s holding as endorsed by *Strickland*: that conflicts represent breaches to the basic duty of loyalty owed a defendant, and that because it is difficult to measure the effect of conflicts on counsel's representation, a presumption of prejudice is reasonable where a conflict adversely affects counsel's performance.[37]

The Sixth[38] and Eleventh[39] Circuits have cited the *Mickens* dicta in their refusals to grant habeas relief to petitioners. But the precedential value of these cases is doubtful. These cases were decisions in habeas petitions in which the petitioner had to show that his conviction was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court[.]"[40] Even if a court thought that *Cuyler should* be applied to conflict cases generally, it must be admitted that there is no Supreme Court decision holding that prejudice must be presumed where the attorney's asserted conflict of interest does not arise from concurrent multiple representations. The absence of Supreme Court precedent alone was sufficient reason to deny the petition in these cases.

*3. Military courts*

The Court of Appeals for the Armed Forces (CAAF) has called for a "case-by-case" determination of whether a conflict is so inimical to effective representation as to be inherently prejudicial, or whether a potentially conflicted counsel's representation should be reviewed for specific prejudice.[41] And when military courts have examined a conflicted counsel's representation for prejudice, they have not settled on an approach.

---

[34] *See United States v. Lafuente*, 426 F.3d 894, 898 (7th Cir. 2005) (addressing successive representation of potentially conflicted clients).

[35] *See Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005) (addressing conflict between attorney's personal interest and client's interests).

[36] *See United States v. Flood*, 713 F.3d 1281, 1286 fn1 (10th Cir. 2013) (applying *Cuyler* to third-party fee arrangement).

[37] *Strickland,* 466 U.S. at 692.

[38] *Smith v. Hofbauer*, 312 F.3d 809, 813, 817-18 (6th Cir. 2002). *But see Rugiero v. United States*, 330 F. Supp. 2d 900, 905 (E.D. Mich. 2004) (applying *Cuyler* to conflict between attorney's personal interest and client's interests).

[39] *See Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006).

[40] *See* 28 U.S.C. § 2254(d)(1) (2012).

[41] *United States v. Saintaude,* 61 M.J. 175, 179-80 (C.A.A.F. 2005).

The CAAF has held that some conflicts—including conflicts between a client's interest and his attorney's—can be so inherently prejudicial that courts will not require a specific showing of actual prejudice. In *United States v. Cain*, the CAAF held that a coercive homosexual relationship between a defense counsel and an enlisted client accused of forcible sodomy presented so great a conflict between the client and the personal interests of the attorney that prejudice should be presumed.[42]

The CAAF has applied *Strickland* to cases in which an appellant has alleged conflicts of interest. In *United States v. Saintaude*, the CAAF applied the second prong of the *Strickland* test to determine that various "potential conflicts" between the appellant and his civilian and military counsel did not warrant reversal.[43] In that case, the court found that none of the potential conflicts had "developed into deficiencies so serious as to deprive him of a fair trial, that is, a trial whose result was reliable."[44] Citing *Cuyler, Mickens*, and *Cain*, the CAAF stated that outside of the multiple representation context, most cases will require specifically tailored analysis in which the appellant must demonstrate prejudice under *Strickland*.[45]

But our superior court has also applied *Cuyler*'s adverse-effect-on-counsel's-performance test, both before and after the Supreme Court's cautionary dicta in *Mickens*. In *United States v. Babbitt*, a married civilian defense counsel had sexual intercourse with the appellant the evening before the last day of her trial.[46] On appeal, the appellant argued that the sexual relationship created a conflict of interest between her and her counsel, and that prejudice should be presumed. The Court of Military Appeals declined to conclusively presume prejudice, instead applying the *Cuyler* standard to a case not involving either concurrent or serial representation of multiple clients.[47]

Since *Mickens*, the CAAF has applied *Cuyler* to a conflict case resembling our own. In *United States v. Lee*, the CAAF considered the case of an officer whose defense counsel assumed duties as a trial counsel during the course of the appellant's representation at trial.[48] The majority in *Lee* determined

---

[42] 59 M.J. 285, 295 (C.A.A.F. 2004).

[43] 61 M.J. at 180.

[44] *Id.* (citation omitted)

[45] *Id.*

[46] 26 M.J. 157 (C.M.A. 1988).

[47] *Id.* at 159. *See also United States v. Smith*, 36 M.J. 455, 457 (C.M.A. 1993) (applying *Cuyler* test to conflict involving successive representation).

[48] 66 M.J. 387 (C.A.A.F. 2008).

further factfinding was required and ordered a *DuBay* hearing.[49] Implicitly endorsing the *Cuyler* standard, the court ordered the *DuBay* judge to determine, among other things, "[w]hat effects on the representation can the accused point to resulting from any claimed conflicts of interest on the part of his detailed defense counsel."[50]

Although the *Lee* court divided 3-2 over whether to return the case for further factfinding, both the majority and the dissent agreed that the *Cuyler* standard was the relevant standard for determining whether the conflict was prejudicial.[51] In dissent, Judge Ryan, joined by Judge Stucky, expressly endorsed the use of the *Cuyler* test for prejudice in conflict cases where the conflict of interest does not rise to structural error:

> The Supreme Court explicitly provided for this type of case, holding that prejudice may be presumed, when defendant's counsel is burdened by an actual conflict of interest. . . . But to establish an actual conflict of interest, the defendant must demonstrate that his counsel actively represented conflicting interests *and* that an actual conflict of interest adversely affected his lawyer's performance.[52]

Since Lee had not shown that the conflict had affected his counsel's performance, it was not necessary, according to the dissent, to resolve whether his counsel was actively representing conflicting interests.[53]

We do not view the conflict in *Lee* as one presenting the same problems associated with concurrent representation of conflicted clients. Lee's counsel transferred to the prosecution office during the course of Lee's representation, and his prosecutorial duties were supervised by the trial counsel in Lee's case.[54] Unlike cases in which counsel simultaneously represent co-accuseds with conflicting interests, it would have been possible for the counsel in *Lee* to zealously represent that appellant and still zealously represent the government while working for opposing counsel as trial counsel. The conflict in *Lee* was, like the conflict here, between the client and the defense counsel's

---

[49] *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967).

[50] *Lee*, 66 M.J. at 390.

[51] *Id*. at 390, 392.

[52] *Id*. at 392 (Ryan, J. dissenting) (citations and internal quotation marks omitted) (emphasis in the original).

[53] *Id*.

[54] *Id*. at 388.

personal interests. The CAAF's use of the *Cuyler* test in that circumstance is significant.

Since *Mickens*, service courts have also used *Cuyler* in conflict cases not involving concurrent representation. In *United States v. Akbar*, the Army Court of Criminal Appeals adopted *Cuyler*'s framework in the context of examining an alleged conflict between counsel's interests and an appellant's (the appellant's counsel was a professional acquaintance of one of the appellant's victims).[55] We too have used *Cuyler* in cases not involving simultaneous representation of clients with conflicting interests. In *United States v. Diaz,* we addressed the successive representation of two clients, the first of which might have been a sentencing witness against the second had she been called by the government.[56] We found that prejudice would be assumed only if the appellant could show that counsel actively represented conflicting interests and that a conflict of interest adversely affected counsel's performance.[57]

Military practice can present distinct conflicts of interest. Apart from the military precedent discussed above, there is another line of cases dealing specifically with conflicts of interest that arise from senior-subordinate relationships between trial counsel and defense counsel. Both before and after *Strickland*, military courts have closely scrutinized conflicts arising from military position or assignment and their potential effect on counsel effectiveness.

In *United States v. Hubbard*, the Court of Military Appeals declined to find that a senior-subordinate relationship between trial and defense counsel was prejudicial *per se*, but held that it "should be closely scrutinized for possible prejudice to an accused[.]"[58] Eleven years after *Hubbard*, the American Bar Association's Standing Committee on Ethics and Professional Responsibility informally opined that, absent full disclosure of the conflict to the client, "a military lawyer . . . should never voluntarily represent a client if the lawyer has to oppose an officer who prepares efficiency reports on the lawyer or otherwise has command authority over the lawyer."[59] Military

---

[55] *United States v. Akbar*, No. 20050514, 2012 CCA LEXIS 247, at *38-39, mem. op. (A. Ct.Crim. App. 13 Jul 2012).

[56] 61 M.J. 594, 602 (N-M. Ct. Crim. App. 2005), *aff'd*, 64 M.J. 176 (C.A.A.F. 2006) (summary disposition); *see also United States v. Diaz,* No. 200200374, 2004 CCA LEXIS 127, at *13 unpublished op. (N-M. Ct. Crim. App. 2004).

[57] *Id*. at 602.

[58] 43 C.M.R. 322, 324 (C.M.A. 1971).

[59] American Bar Association's Standing Committee on Ethics and Professional Responsibility, Informal Opinion No. 1474 (1982).

courts have adopted this position and accept that a senior-subordinate relationship between trial and defense counsel presents a conflict of interest, albeit one that the accused may waive.[60]

In *United States v. Whidbee*, a case decided five years after *Strickland*, the Coast Guard Court of Military Review addressed a conflict arising from a senior-subordinate relationship between trial and defense counsel.[61] That court took a dim view of these conflicts: "the relationship here between defense counsel and trial counsel is such that it always presents an actual conflict of interest that is inherent and irrefutable."[62] Absent a waiver, that court viewed prejudice as "conclusively presumed."[63] Since the government could not meet its "very heavy burden" to establish that the conflict had been waived, the Coast Guard court set the findings aside.[64]

Of course, this line of cases is not directly applicable to the relationships between counsel in this case. Capt KC was not herself serving as a trial counsel, nor was she a subordinate of one. Capt KC's conflicts were attenuated by the fact that her position as a prosecutor was anticipated rather than contemporaneous, and it was her spouse, not she personally, who worked for the lead trial counsel. But the attenuated conflicts that she faced—and failed to disclose to her client or the military judge—were operationally similar to the ones at issue in *Whidbee*. Although we do not rely on *Whidbee* and will not apply its conclusive presumption of prejudice, this line of cases informs our approach. We are mindful that conflicts arising from military command relationships can be highly prejudicial to the loyalty—and the appearance of loyalty—that is owed an accused.

We agree with the majority of the circuit courts of appeals, and will evaluate this case under *Cuyler*. We hold that where an appellant demonstrates that his counsel labored under an actual conflict of interest, and where the conflict had an adverse effect on the counsel's performance, the appellant is entitled to a presumption of prejudice.

A *potential* conflict of interest does not entitle an appellant to *Cuyler*'s limited presumption of prejudice and, where no actual conflict exists, counsel's performance will be evaluated under *Strickland*'s familiar two-pronged test.[65] A potential conflict exists if the interests of an accused may

---

[60] *See e.g. United States v. Nicholson*, 15 M.J. 436 (C.M.A. 1983).

[61] 28 M.J. 823 (C.G.C.M.R. 1989).

[62] *Id*. at 826.

[63] *Id*. at 830.

[64] *Id*. at 827, 830.

[65] *See Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013).

place the defense counsel under inconsistent duties at some time in the future.[66] We think this approach is the one that best reconciles the CAAF's approaches in both *United States v. Saintaude* and *United States v. Lee*. In *Saintaude*, the defense counsels' "potential conflicts" (the CAAF's term) consisted primarily of unsubstantiated accusations against counsel and allegations that one civilian counsel's friendship with a prior civilian defense counsel made him reluctant to press the prior counsel for essential case files.[67] These were purely speculative allegations of conflict and warranted no presumption of prejudice. An actual conflict is a necessary but insufficient prerequisite to benefit from *Cuyler*'s limited presumption. A conflict of interest is actual, as opposed to potential, when, during the course of the representation, "the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action."[68]

In addition to an actual conflict, an appellant must also show that the conflict of interest adversely affected counsel's performance.[69] This means that an "actual lapse in representation" resulted from the conflict.[70] An adverse effect "cannot be presumed from the mere existence of a conflict of interest."[71] To prove a lapse in representation, an appellant must show "that some plausible alternative defense strategy or tactic might have been pursued," but was not, and that "the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."[72] If an appellant shows that a conflict of interest existed and that it adversely affected counsel's performance, *Strickland* counsels a "fairly rigid rule of presumed prejudice" and the appellant need not demonstrate a reasonable probability that, but for the attorney's conflict, the trial's outcome would have been different.[73]

We believe that the logic of *Strickland*'s carve-out for conflict cases applies equally to all cases in which there is an *actual* conflict of interest: "[I]t

---

[66] *Ventry v. United States*, 539 F.3d 102, 111 (2nd Cir. 2008) (quoting *United States v. Klitt*, 156 F.3d 150, 153 n.3 (2d Cir. 1998)).

[67] 61 M.J. at 180-81.

[68] *United States v. Perez*, 325 F.3d 115, 125, (2d Cir. 2003) (citation and internal quotation marks omitted).

[69] *Mickens,* 535 U.S. at 171.

[70] *Winkler v. Keane*, 7 F.3d 304, 309, (2d Cir. 1993) (quoting *Cuyler*, 446 U.S. at 336).

[71] *Rubin*, 292 F.3d at 401 (citation omitted).

[72] *Winkler*, 7 F.3d at 309 (citations and internal quotation marks omitted).

[73] *Strickland*, 466 U.S. at 692.

is difficult to measure the precise effect on the defense" when representation is "corrupted by conflicting interests."[74] And a conflict that adversely affects a counsel's performance "calls into question the reliability of the proceeding and represents a breakdown in the adversarial process fundamental to our system of justice."[75]

We have considered the position of the minority of circuits that decline to apply *Cuyler* in these cases. We agree that the potential for conflict between counsel and clients is limitless, and that the range of possible consequences is broad. Simple disagreements about tactics and unsubstantiated accusations of unethical conduct, such as those the CAAF faced in *Saintaude*, are appropriately addressed under the *Strickland* standard. But by requiring an actual conflict that adversely affected counsel's representation, we can be certain that we are reserving *Cuyler*'s limited presumption for only those cases in which the duty of loyalty has actually been breached. And it is this breach of the fundamental duty of loyalty—and its deleterious, hard-to-quantify effect on the reliability of the proceeding—that is the rationale for the presumption in the first place.

## B. Application of *Cuyler*'s first prong: Was there an actual conflict of interest?

Having decided to evaluate this case under *Cuyler*, we first must determine whether Capt KC had an actual conflict of interest with the appellant. Under the professional responsibility rules applicable to the appellant's defense counsel, a conflict of interest exists when there is a significant risk that the representation will be materially limited by that attorney's personal interests.[76] This general guidance is supplemented by further, more specific guidance: Attorneys may not represent an accused and serve as a prosecutor at the same time.[77] Also, trial counsel may not prosecute cases where he or she is the defense counsel's immediate superior and participates in the evaluation of the defense counsel.[78] Of course, Capt KC was not herself a trial counsel, nor was she trial counsel's subordinate. And LtCol CT presumably did not have any say in her officer evaluations at that time.

---

[74] *Id.*

[75] *Rubin*, 292 F.3d at 402.

[76] *See* Dep't of the Navy, Judge Advocate General Instruction 5803.1E [hereinafter JAGINST 5803.1E], Professional Conduct of Attorneys Practicing under the Cognizance and Supervision of the Judge Advocate General (2015), Rule 1.7a.

[77] *See Lee*, 66 M.J. at 388.

[78] *Nicholson*, 15 M.J. 436.

As for the senior-subordinate relationship between LtCol CT and Capt KC's husband, we are not inclined to automatically impute Capt KC's husband's disqualification to Capt KC.[79] Likewise, we distinguish between the forbidden conflict, in which a defense counsel reports to an opposing trial counsel as a military superior, and Capt KC's circumstance in which she merely believed that she would be transferred the prosecution office at a later time. We find no authority that requires us to find a conflict of interest based solely on Capt KC's anticipated duties or her marriage to Capt CC.

But even if we find that any one of Capt KC's circumstances did not call for her automatic disqualification, this finding does not mean that her representation of the appellant was free from actual conflict. Comment (4) to JAGINST 5803.1E, Rule 1.7 informs our analysis here: "Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a covered attorney's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the covered attorney's other responsibilities or interests." In considering whether such a risk exists, it is appropriate to evaluate the cumulative effect of all of the facts that could create a conflict of interest.

The potential conflict of interest lay in Capt KC's personal circumstances. She anticipated becoming a trial counsel in LtCol CT's region shortly after the trial. She was also married to a current trial counsel in the region, which meant that LtCol CT was her husband's RO. Capt KC would have been wise to disclose these circumstances to the appellant and to the military judge. These circumstances, however, did not have to result in an actual conflict as that term is understood in the context of a *Cuyler* analysis, or at least not a conflict that ran afoul of *Cuyler*'s second prong. Had everyone involved appreciated the precarious nature of Capt KC's situation and taken care to allow her complete freedom of action as a defense counsel, perhaps her representation would not have been adversely affected.

Unfortunately, that is not what happened. Instead, as the case wore on, the vulnerabilities in this arrangement were—perhaps unintentionally— exploited, and her representation was compromised. The facts that aggravated the potential conflicts and made them actual arose both before and during the trial, and both on and off the record. Individually, some of the facts we describe below would not be sufficiently troubling to make the potential conflicts in this case actual conflicts. But considering them

---

[79] *See* JAGINST 5803.1E, Rule 1.8.c.(d); *see also* Model Rules of Prof'l Conduct R. 1.7 comment. (2012) ("The disqualification arising from a close family relationship is personal and ordinarily is not imputed to members of firms with whom the lawyers are associated.").

collectively, it is our judgment that the defense in this case was laboring under an actual conflict of interest.

First, LtCol CT made it clear that he took personal offense at trial defense counsel's advocacy, and that he did not like the way defense counsel were trying the case. We expect that trial counsel do not normally take defense counsel's tactics personally. In this case, LtCol CT did, and sometimes for no apparent reason.

Trial counsel's reaction to the appellant's motion to suppress evidence is one example. The defense filed a motion to suppress evidence of steroid use found in the appellant's gym bag by the Anchorage police. During the argument on the motion, defense counsel expressed skepticism about the testimony of two civilian law enforcement officers who testified for the government. LtCol CT reacted sharply, telling the military judge that he wanted to address "a concern the government is continuing to see from the defense."[80] He complained that "[t]he defense has just impugned the integrity of two officers, in particularly [sic] a detective . . . . Unprofessional. I am floored that I had to hear this come out of the mouth of an officer of this Court."[81]

The motion was an appropriate one to bring. And we find nothing surprising or remarkable about the way Capt KC or Capt JS questioned witnesses or argued the motion. Even if defense counsel "impugned the integrity of two [civilian law enforcement] officers,"[82] as LtCol CT accused them of doing, there would be nothing remarkable about it. The testimony of law enforcement officers is not presumed to be beyond challenge. Had defense counsel been able to pursue normal defense strategies without facing personal condemnation from trial counsel, the potential conflicts in this case might have not developed into actual ones. But in the face of unremarkable defense motions practice, LtCol CT expressed shock and personal offense.

Trial counsel also became upset after defense counsel sought to impeach SK with evidence of a prior conviction under MILITARY RULE OF EVIDENCE 609, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). LtCol CT made the following comment about trial defense counsel's advocacy:

> I think that in response to our last discussion on the [MIL. R. EVID.] 609, I was visibly upset. Although it's not reflected in the record, and there has only been one other time in this case where I had to listen to [Capt JS] impugn the integrity of a

---

[80] *Id.*

[81] Record at 332.

[82] *Id.*

witness, I am now sitting here and listening to stuff that I do believe to be gross. This is a pattern within the circuit that has happened in the past four weeks . . . .[83]

During arguments, LtCol CT referred to some of Capt KC's argument as "absurd" and, more troublingly, "disgusting." He stated to the members that one of her theories of the case was an "affront" to him and the trial team. We find that LtCol CT's expressions of great personal offense at the defense's conduct of the trial—some of which involved standard defense challenges to the government's evidence—tended to aggravate the potential conflicts in this case.

There were other, off-the-record comments as well. According to a post-trial affidavit signed by Capt KC's husband, Capt CC, the subject of this case came up during an off-site training event. At the event, LtCol CT mentioned to a third person in Capt CC's presence that he had a case against Capt CC's wife. LtCol CT said to Capt CC, "I am not going to stop holding that against you," or words to that effect.[84] Capt CC replied that LtCol CT should not say things like that. According to Capt CC, LtCol CT asked why not, and Capt CC answered that it could result in LtCol CT's being removed from the case. LtCol CT responded by saying that it would only get him removed if Capt CC told his wife (Capt KC) about it.

Capt CC thought that LtCol CT was joking when he said these things. But he "decided it was prudent to write the comment down to protect [himself] in the event [LtCol CT] was not joking."[85] Capt CC recorded the exchange on notebook paper and then transferred the writing to a word processing file. That night, Capt CC told his wife about the conversation, and expressed concern about whether LtCol CT should be his reviewing officer.

There are other examples of off-the-record exchanges that tended to aggravate the potential conflict. One occurred after a motion session while counsel were still in the courtroom. LtCol CT told Capt KC, "If [you] were [your] husband, I would punch you in the face right now."[86] Another time, while discussing a defense discovery request, LtCol CT told Capt JS, "If you were my peer, I would have told you to f*** off."[87]

---

[83] *Id.* at 867.

[84] Third Staff Judge Advocate's Addendum, Enclosure (1), Affidavit of Capt CC of 9 Oct 2015 at ¶6 (hereinafter Affidavit of Capt CC).

[85] *Id.*

[86] Record at 1787.

[87] *Id.* at 1788. *See also id.* at 1723.

18

LtCol CT later testified that, while he had "no doubt that [he] likely said" things like "[d]on't make me punch you in the throat" to defense counsel, such statements would have been for purposes of "levity," and not for the purpose of intimidating defense counsel.[88] It is plausible that this explains some of the remarks. Judge advocates sometimes talk this way when litigating a case—perhaps even when they are not especially angry.[89] Capt KC also tried to be dismissive about the things LtCol CT said, agreeing with the statement of trial defense counsel during the post-trial Article 39(a) session that, "I mean, there is rough and tumble in two places: One, the Marine Corps; and, two, in criminal litigation."[90] She testified that she resolved to not let anything LtCol CT said affect the decisions she made in the case. But there is no doubt that LtCol CT became angry with defense counsel. He testified to that fact, and the record makes it plain. And LtCol CT's remark about holding Capt KC's representation of the appellant against Capt CC, which we ordinarily might dismiss as obviously jocular, was concerning enough under the circumstances that Capt KC's husband wrote it down to preserve it.

If any doubt remained about whether the potential conflict posed by Capt KC's circumstances ripened into an actual conflict, it is resolved by two off-the-record exchanges: one between LtCol CT and Capt KC, and one between Capt KC and her husband.

Capt KC visited LtCol CT's temporary office in Anchorage shortly before trial to discuss the government's exhibits and witnesses. She told LtCol CT that she would be objecting to some of his evidence and requiring him to lay a foundation for a photographic lineup of the appellant. LtCol CT thought this was not an appropriate approach. In the context of this discussion, LtCol CT told Capt KC, "Remember, you're coming back to the government sometime," or words to that effect.[91]

After the meeting, Capt KC told Capt JS and the defense's highly qualified expert (DHQE) about this exchange. According to the DHQE, she and Capt JS insisted to Capt KC that she make LtCol CT's remark about "coming back to the government" the subject of a motion. The DHQE thought that the military judge should know about the remark, and she told Capt KC that LtCol CT should be disqualified from participation in the case.

---

[88] *Id.* at 1854.

[89] *Cf. United States v. Smith*, 27 M.J. 242, 252 (C.M.A. 1988) ("I know that young judge advocate officers love witty exchanges, practical jokes, and a sense of the macabre in their humor; and normally little if any significance should be given use of terms like 'hardcore' to categorize a potential court member.") (Cox, J., concurring).

[90] Record at 1788.

[91] *Id.* at 1793.

Although the defense did not file any motions based on LtCol CT's comments to defense counsel, they did move to dismiss the specifications involving SK for prosecutorial misconduct during trial. The motion was denied by the military judge, and the appellant does not challenge that ruling now. But the facts surrounding the motion, and the way it was litigated, figure prominently in the appellant's allegations of both prosecutorial misconduct and ineffective assistance of counsel.

The motion was based on interactions between SK and the government's highly qualified expert (GHQE), a civilian attorney who advised the trial counsel and, in this case, served as a liaison between the uniformed trial counsel and SK. The government was unsure of SK's continued cooperation in this case, and the GHQE established a personal relationship with SK calculated to encourage her continued participation. The GHQE, who was co-located with trial counsel at Camp Pendleton, exchanged frequent text messages with SK, sometimes about personal matters unrelated to the case. SK came to trust the GHQE and came to view her as a friend rather than a member of the prosecution team. The relationship between the GHQE and SK was personal enough that SK asked the GHQE for help obtaining Social Security payments, which the GHQE provided.

At one point in the texts, SK indicated that she was going to tell her relatives not to answer calls from unknown numbers so that they would not end up speaking to a defense counsel. SK said this because she was upset with the nature of the questions the defense team was asking potential witnesses. The GHQE told SK that they were dealing with the issue in court. Capt KC met with the prosecutors to complain about the texts. She thought that the GHQE had a duty to tell SK not to "obstruct justice"[92] by telling her relatives to not answer their phones, and this complaint formed the basis of Capt KC's motion to dismiss for prosecutorial misconduct.

At some point after the DHQE and co-counsel urged her to bring LtCol CT's "coming back to the government" comment to the attention of the court, and after her meeting with the prosecution regarding the text messages, Capt KC had a phone conversation with her husband. She told him that she was considering raising prosecutorial misconduct against the GHQE and LtCol CT. During this conversation, Capt CC told Capt KC that "if she raised the issue I would probably have to ask that someone other than [LtCol CT] serve as my RO."[93] Capt CC did not want to take this step. Capt CC stated in his affidavit that he was in a "difficult position" because "bringing the issue up would amount to saying that [LtCol CT] did not have the ability to rank me

[92] *Id.* at 867.

[93] Affidavit of Capt CC of 9 Oct 2015 at ¶ 9.

appropriately based on the poor relationship between him and my wife."[94] In other words, Capt KC's husband, who was LtCol CT's subordinate for evaluation purposes, discussed with Capt KC the negative ramifications to him of a motion Capt KC might have filed on the appellant's behalf. This circumstance weighs heavily in favor of finding an actual conflict of interest between Capt KC and the appellant.

Based on the totality of circumstances, we conclude that the appellant has established that an actual conflict of interest existed.

## C. Application of *Cuyler*'s second prong: Was counsel's performance adversely affected by the conflict of interest?

Next we must determine if the conflict of interest adversely affected counsel's performance. We conclude that it did.

Many of the facts necessary to reach this conclusion were developed in a post-trial Article 39(a) session ordered by the convening authority. The appellant hired civilian counsel for this session, and his two uniformed trial defense counsel, the DHQE, and LtCol CT were among the witnesses. The post-trial Article 39(a) session developed evidence on the conflict of interest, but it did not produce an explicit finding of fact on this issue. The military judge made one finding of fact during the post-trial 39(a) hearing—that LtCol CT had in fact reminded Capt KC that she was coming back to be a trial counsel. The military judge found all of the witnesses credible, with the exception of Capt JS, whose testimony is not significant to our determination here. We also note that at the time of the Article 39(a) session, Capt KC had apparently still not revealed, and did not reveal at the hearing, that she and her husband had discussed her consideration of a prosecutorial misconduct motion against LtCol CT and the professional ramifications of such a motion on her husband. That even this important fact was not disclosed at the post-trial Article 39(a) session causes us to doubt the utility of further factfinding in this case.[95] In oral argument, both the appellant and the government stated that further factfinding was unnecessary.

The civilian defense counsel examined Capt KC about her interactions with the government and how the collective actions of LtCol CT affected her representation. Capt KC admitted that her meeting with LtCol CT in which he mentioned her return to the government left her feeling "scrutinized,"[96]

---

[94] *Id.* at ¶ 10.

[95] *Cf. Lee*, 70 M.J. at 538 (". . . [T]he reluctance of the various participants to lay bare the facts . . . cause[s] us to wonder whether the whole truth can ever be known.").

[96] Record at 1794.

and she believed that LtCol CT had "personally attacked" her and Capt JS in his response to the prosecutorial misconduct motion and during the closing arguments. When asked if the government's conduct affected her representation, Capt KC answered tepidly. She acknowledged that her co-counsel and the DHQE thought that she had been "compromised," but responded, "I would like to say that it didn't have an effect. . . . I am of the position that I represented my client to the best of my ability."[97] Finally, Capt KC admitted that she did not tell the appellant about LtCol CT's off-the-record comments to her, nor did she tell him that she could move to disqualify LtCol CT.

The record convinces us that Capt KC's representation was adversely affected by the conflict of interest. The conflicts presented in this case were obviously significant and upsetting to Capt KC. After Capt KC moved to dismiss the charges involving SK because of the GHQE's text messages, LtCol CT—her prospective RO and her husband's current RO—accused the defense of unethical conduct. LtCol CT called the possibility that defense counsel might be asking potential witnesses about evidence governed by MIL. R. EVID. 412 and 513 "gross and cruel."[98] All this caused Capt KC to audibly sob at counsel table, and she was unable to continue.

Capt KC made several decisions about the appellant's representation that were against her client's interest, against the advice of the DHQE, and consistent with a concern for her and her husband's situation. The DHQE testified that she and Capt JS had urged Capt KC to make LtCol CT's remark about "coming back to the government" the subject of a motion. She told Capt KC that LtCol CT should be removed from the case. Capt KC refused to raise the issue, and ultimately Capt JS acceded to this decision. According to the DHQE, Capt KC's reason was that filing such a motion would be inconsistent with the way things were done in the Marine Corps, and that it would cause problems.

Capt KC did argue that the GHQE had committed prosecutorial misconduct, as she had told her husband she might. But her husband told her that he would probably have to ask for another RO if she made the motion, and she declined to raise the issue of LtCol CT's conduct. Even absent a finding of prosecutorial misconduct, the facts may have warranted disqualifying LtCol CT from further participation in the case, given the nature of the comments and the circumstances of Capt KC's representation. If nothing else, Capt KC could have simply notified her client and the court of the comment. But in spite of the fact that the DHQE and her co-counsel

---

[97] *Id.* at 1796.

[98] *Id.* at 870.

urged her to tell the court, Capt KS refused to inform the military judge or her client about the comment.

The DHQE also testified that she and Capt JS urged Capt KC to object during trial counsel's closing argument, but that Capt KS did not. The DHQE's conclusion was Capt KC had not objected because she had been intimidated by the trial counsel. Some of this argument was plainly objectionable. For example, LtCol CT argued that evidence that the appellant used steroids tended to show that he had a criminal disposition:

> Now, you may not think that the use of steroids is that dramatic, is that appalling; it should be. You do know that it is punishable under the Uniform Code of Military Justice, and you do know there is extensive evidence that supports a conviction on that charge.

> But think back to my earlier theme. I know there may have been many that you have heard. But my concern—the government's belief, that man seated over there is someone who lives above the law. And this is one nugget of proof, that he does believe that he is above the law. He is above the laws and values that govern and guide us all, whether it be in society or whether we are in the United States Marine Corps.[99]

The argument is obviously erroneous, yet Capt KC did not object. The DHQE and her co-counsel urged her to object several times during LtCol CT's initial closing argument. We conclude that a reason that Capt KC ignored the DHQE's and Capt JS's prompts to object was her conflict of interest.

One of Capt KC's most important duties in this case was to disclose the circumstances of her representation to her client and to the court. Once the court was on notice of the possible conflict and other aggravating circumstances, the military judge would have been able to conduct an inquiry into the nature of the conflict and seek either a knowing and intelligent waiver of the right to conflict-free counsel from the appellant[100] or disqualify Capt KC (or LtCol CT) from further participation in the case.[101]

---

[99] *Id*. at 1421-22.

[100] *United States v. Lee*, 66 M.J. at 388 (stating that an accused may waive this right to conflict-free counsel, but this must be done voluntarily and with "sufficient awareness of the relevant circumstances and likely consequences" as to be knowing and intelligent) (citations and internal quotation marks omitted); *but see Wheat v. United States*, 486 U.S. 153, 163 (1988) (holding that the judge must be allowed substantial latitude in refusing to accept an defendant's waiver of a conflict of interest "not only in those rare cases where an actual conflict may be demonstrated

We find that she did not fulfill this duty, and that one of the reasons for that failure was the conflict of interest itself. Capt KC decided to tell no one— apparently including her co-counsel—about the phone call in which her husband directly discussed the consequences to him personally if Capt KC filed a particular motion in the appellant's case. At this point the conflict of interest stood in sharp relief. She had an obligation to disclose the phone call to her client and the military judge. She did not disclose it, and the call apparently remained undisclosed even through her testimony at the post-trial Article 39(a) session. Since her failure to disclose the phone call persisted even through the post-trial session, she did not testify about why she decided not to reveal the phone call to co-counsel, the client, or the military judge. But it is inescapable that had she disclosed the phone call, her husband would have found himself in the same "difficult position" he sought to avoid. We conclude this was a factor in Capt KC's failure to disclose this important information to the client and the court.

The fact that the assistant defense counsel, Capt JS, was not conflicted does not change the fact that the appellant's representation was adversely affected by the conflict of interest. Capt JS accepted the lead counsel's decision to not file a prosecutorial misconduct motion or to notify the court about trial counsel's statements. Nor is there any evidence that he informed the appellant about these issues.[102] For this reason, we find that the conflict affected the performance of the defense team, not just Capt KC.

We conclude that Capt KC had an actual conflict of interest in this case. We further conclude that the conflict adversely affected the appellant's representation. We therefore require no further showing of prejudice to determine that the findings and sentence should be set aside.

**D. Analysis under Article 66, UCMJ**

Even if we were to conclude that *Cuyler*'s presumption of prejudice did not apply to this case, or that the appellant could not adequately prove prejudice, we would still set aside the findings in this case, because they should not be approved. Article 66, UCMJ, states that a service court of criminal appeals "may affirm only such findings of guilty, and the sentence or such part or

---

before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses").

[101] RULE FOR COURT-MARTIAL 505(d)(2)(B), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.); *United States v. Spriggs*, 52 M.J. 235, 240 (C.A.A.F. 2000).

[102] *Cf. Lee*, 70 M.J. at 540 (concluding that defense team as a whole could not be evaluated where conflicted counsel did not adequately inform co-counsel about the extent of the conflict, and co-counsel did not remedy conflict through disclosure to client and military judge).

amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved."[103] Our superior court has described this duty as an "awesome, plenary, *de novo* power of review,"[104] and likened service courts to "the proverbial 800-pound gorilla when it comes to their ability to protect an accused."[105] "A clearer *carte blanche* to do justice would be difficult to express."[106]

But "[t]here are *some* places where even 'the proverbial 800-pound gorilla' is not free to roam," and our authority under Article 66 is not without limits.[107] In *United States v. Nerad*, the CAAF set the boundaries of our authority to "do justice" under Article 66.[108] We are not authorized to grant clemency[109] or set aside findings or sentences on equitable grounds.[110] We may not disapprove findings because we disagree with Congress' determination that certain conduct should be criminalized.[111] But Article 66 does grant us authority to determine whether we should approve a finding or sentence even when application of a legal doctrine such as waiver or harmless error would normally preclude action.[112]

This brings us to our published case *United States v. Lee,* a case similar in some ways to this one and decided shortly after *Nerad.*[113] We have already discussed the CAAF's earlier opinion in that case, in which the detailed defense counsel began performing trial counsel duties during the course of his representation of the appellant. The CAAF ordered a *DuBay* hearing and directed that we conduct a new review under Article 66. Our decision in *Lee* was the result of that review.

Much as we have done here, in *Lee* we reviewed the approaches courts have used in conflict cases. We did not need to decide whether *Cuyler* or

---

[103] 10 U.S.C. § 866(c).

[104] *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990).

[105] *United States v. Parker*, 36 M.J. 269, 271 (C.M.A. 1993).

[106] *United States v. Claxton*, 32 M.J. 159, 162 (C.M.A. 1991) (citations omitted).

[107] *Parker*, 36 M.J. at 273 (Wiss, J., concurring) (emphasis in the original).

[108] *Nerad*, 69 M.J. at 146 (quoting *United States v. Boone*, 49 M.J. 187, 192 (C.A.A.F. 1998)).

[109] *Boone*, 49 M.J. at 192.

[110] *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001).

[111] *Nerad*, 69 M.J. at 146.

[112] *Id.* at 146-47.

[113] 70 M.J. 535.

*Strickland* applied to ineffective assistance claims involving conflicts of interest. We found that after the *DuBay* hearing, that appellant could not meet his burden under either standard. Lee was unable to show that the conflict affected his counsel's performance (*Cuyler*) or that there was a reasonable probability that the error affected the outcome of the proceeding (*Strickland*). Therefore, we found that under either test, we would be obliged to affirm the findings and sentence under Article 59, UCMJ.[114] But we did not end our analysis there.

Although we found that the appellant could not show that his counsel's conflict adversely affected his representation, we determined that the findings in that case should not be approved. We noted the difficulties the hearing officer had in ascertaining from the counsel involved in the case what the relevant facts were. Ultimately, we considered the command relationships between counsel and the potential for conflict they introduced. We found that "the system of identifying and resolving professional conflicts of interest failed the appellant" in that case.[115] We found that his counsel "were laboring under a professional disability that [the appellant] did not fully understand; it may be that his counsel themselves did not fully understand the disability."[116] A troubling result of this failure was that no counsel brought the issue of potential conflicts to the attention of the military judge.[117] Lee therefore "did not benefit from the sober and detached perspective of the military judge whom our system empowers to hear and resolve professional conflicts[.]"[118] Finally, we considered the effect the facts of that case would have on a member of the public's confidence in the proceeding and concluded that the findings should not be approved.[119]

The conflict in the appellant's case, although theoretically more attenuated than the one in *Lee*, is more aggravated. There was no indication in *Lee* that either the defense counsel or the trial counsel felt any actual conflict concerning their roles. Most counsel in courts-martial do not take disagreements arising during litigation personally. The conflict in *Lee* was essentially a matter of *malum prohibitum*; it was a conflict because the rules say it was. In reality, the counsel in *Lee* may well have felt no hesitation about zealously advocating for his client's interests.

---

[114] *Lee*, 70 M.J. at 539.

[115] *Id*. at 542.

[116] *Id*.

[117] *Id*. at 537-38.

[118] *Id*. at 542.

[119] *Id*.

In this case, an actual conflict is visible. It manifested in decisions Capt KC made not to pursue a prosecutorial misconduct motion against LtCol CT or to object to his closing argument, despite her co-counsel's urging. It was apparent when Capt KC wept at counsel table. It was perhaps most prominent in Capt KC's repeated efforts to minimize or ignore it. When the DHQE told her that she should ask to have LtCol CT removed from the case, Capt KC declined, telling them that she would instead make "absolutely certain" that trial counsel's statement did not affect her.[120] She surely was aware of it when her husband talked to her about the consequences to him if she decided to raise a motion in the case.

As in *Lee*, the counsel in this case failed to disclose the conflict to the appellant. This appellant was actively involved in selecting his defense team. He excused one detailed counsel, kept the other, and requested an individual military counsel. After learning about the issues with his representation during trial, he hired a civilian counsel for the post-trial Article 39(a) session. He had a right to know about his attorney's conflicts, and to weigh that information as he evaluated his counsel's decision making and performance. The appellant, like the appellant in *Lee*, also had a right to "the sober and detached perspective of the military judge whom our system empowers to hear and resolve professional conflicts."[121] The appellant did not receive this; his lead counsel's reluctance to introduce the issue disinclined her to inform him and the military judge.

As was the case in *Lee*, we cannot find that the performance of un-conflicted counsel cured the defects in representation.[122] The post-trial Article 39(a) session reveals that the appellant's co-counsel ultimately acceded to Capt KC's determinations about strategies during the trial. We note that with respect to the un-objected-to argument, Capt JS did insert himself and object to portions of the argument after the argument was over. By that time, however, these efforts could not be particularly effective, and there seem to have been no other efforts from any counsel on either side to inform the court of the conflicts.

In sum, this record presents a disturbing picture. A Marine was convicted of serious offenses and sentenced to 26 years' confinement. His lead counsel opposed a more senior trial team led by the regional trial counsel who was her husband's reviewing officer; she herself anticipated becoming a trial counsel in the region. Rather than inform her client and the military judge,

---

[120] Record at 1771-72; *See also id.* at 1732.

[121] *Lee*, 70 M.J. at 542.

[122] *Cf. Boone*, 42 M.J. at 313.

the lead counsel kept this information to herself. Having committed to this vulnerable arrangement, the defense team was personally and professionally assailed by trial counsel—both on the record and off, and sometimes for utterly unremarkable defense advocacy. When his counsel broke down on the record at counsel table and was unable to continue, the appellant did not know why the acrimony between his counsel and the government might be so troubling to her. When his lead counsel resisted co-counsel's and the DHQE's urgings to object to argument, he did not know all of the potential reasons for the refusal. He did not know lead counsel was resisting co-counsel's and the DHQE's insistence that she bring a motion or at least alert the court to trial counsel's statement about her coming back to the government. Even if he had, he would not have known why such a statement might be so significant. And he did not know that his lead counsel was talking about a potential motion with her trial counsel husband, and that her husband discussed the consequences to him if she brought the motion. This fact was not even disclosed at the post-trial 39(a) session at which the issue of conflicts was addressed.

The sepsis of undisclosed conflict in this case infects much of the record. Even the post-trial Article 39(a) session did not convincingly diagnose the full extent of the conflict or its prejudice. A member of the public fully informed of the facts of this appellant's representation would not have faith in the process that led to these convictions. It is our judgment, based on the entire record, that the findings and the sentence in this court-martial should not be approved.

### III. CONCLUSION

The findings and sentence are set aside. A rehearing is authorized.

Chief Judge GLASER-ALLEN and Senior Judge MARKS concur.

For the Court

R.H. TROIDL
Clerk of Court