IN THE CASE OF

UNITED STATES, Appellee

v.

Jacques SAINTAUDE Jr., Private First Class
U.S. Army, Appellant

No. 04-0178

Crim. App. No. 9801647

United States Court of Appeals for the Armed Forces

Argued January 26, 2005

Decided June 23, 2005

EFFRON, J., delivered the opinion of the Court, in which GIERKE,
C.J., and CRAWFORD, BAKER, and ERDMANN, JJ., joined.

Counsel

For Appellant:  Mary T. Hall, Esq., (argued); Captain Eilin J.
Chiang and Captain Karen W. Riddle (on brief); Colonel Robert D.
Teetsel, Lieutenant Colonel Mark Tellitocci, and Major Allyson
G. Lambert.

For Appellee:  Captain Edward E. Wiggers (argued); Colonel
Steven T. Salata, Lieutenant Colonel Mark L. Johnson, Major
Natalie A. Kolb, and Captain Janine P. Felsman (on brief).

Military Judges:  Richard J. Hough (trial) and Donna L. Wilkins
(sentence rehearing)

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

At a general court-martial composed of officer members, Appellant was convicted, contrary to his pleas, of rape, robbery (two specifications), adultery, and communication of a threat (three specifications), in violation of Articles 120, 122, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 922, 934 (2000). He was sentenced to a dishonorable discharge, confinement for forty-eight years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved these results and credited Appellant with 194 days of confinement for pretrial confinement served. The United States Army Court of Criminal Appeals set aside the three specifications of communicating a threat, and affirmed the remaining findings. The court also concluded that Appellant's trial defense counsel provided ineffective assistance during sentencing, and ordered a rehearing on the sentence. United States v. Saintaude, 56 M.J. 888 (A. Ct. Crim. App. 2002).

At the rehearing, a panel consisting of officers and enlisted members sentenced Appellant to a dishonorable discharge, confinement for thirty-five years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence and credited Appellant with 1,615 days of presentence confinement credit and 196 days

of administrative credit for illegal presentence confinement.
The Court of Criminal Appeals affirmed in an unpublished
opinion. United States v. Saintaude, Army 9801647 (A. Ct. Crim.
App. Oct. 15, 2003).

On Appellant's petition, we granted review of the following
issues, which primarily concern the findings phase of
Appellant's initial court-martial:

> I.   WHETHER APPELLANT WAS DEPRIVED OF HIS RIGHT
>      TO CONFLICT-FREE COUNSEL WHEN ALL FIVE OF
>      HIS COUNSEL LABORED UNDER MENTALLY-
>      COMPETING PERSONAL INTERESTS.
>
> II.  WHETHER APPELLANT RECEIVED INEFFECTIVE
>      ASSISTANCE OF COUNSEL ON THE MERITS
>      WHEN HIS COUNSEL FAILED TO PREPARE AND
>      EXECUTE A REASONABLE DEFENSE STRATEGY,
>      INCLUDING FAILURE TO USE CRITICAL
>      IMPEACHMENT EVIDENCE, AND WHEN HIS
>      MILITARY COUNSEL FAILED TO ADVISE
>      APPELLANT THAT HE BELIEVED THAT
>      CIVILIAN COUNSEL WAS INCOMPETENT,
>      INEFFECTIVE, AND UNPROFESSIONAL.

We shall first consider Issue I, Appellant's contention
that the personal interests of his attorneys conflicted with
their duty of professional loyalty to their client. We shall
then turn to Issue II, in which Appellant alleges specific
deficiencies in the performance of the various attorneys who
represented him before and during trial. For the reasons set
forth below, we conclude that neither the alleged conflicts of
interest nor the alleged defects in performance of counsel

3

resulted in prejudicial error, and we affirm.  See Strickland v. Washington, 466 U.S. 668, 686, 694 (1984).


I. BACKGROUND

From the time Appellant was charged until the beginning of the trial on the merits, Appellant was represented by a number of different attorneys, at different times, in various combinations.  The relationships among counsel, and between counsel and Appellant, were not always harmonious.

A. Representation in the separate military and civilian proceedings

Initially, Appellant faced separate civilian charges and military criminal charges.  In the civilian proceedings, brought by Colorado state authorities, he was represented by two civilian attorneys, Mr. HG and Ms. C.  The civilian charges, which consisted of two robbery specifications, alleged that Appellant robbed two 7-Eleven convenience stores while pretending to be concealing a firearm.

In the military proceedings, Appellant was represented initially by Captain (CPT) L, who withdrew from the case because he previously represented one of the alleged victims.  CPT L was replaced by CPT RB.  The military charges consisted of rape, adultery, and three specifications of the communication of a threat.

B. Representation in the exclusive military proceedings

After civilian authorities relinquished jurisdiction over the two robbery charges, Appellant retained Mr. HG and Ms. C to represent him in the military proceedings. Appellant continued to retain CPT RB as his military counsel. In addition, CPT MC, a defense attorney stationed at Fort Leavenworth, Kansas, was eventually detailed as an assistant defense counsel at CPT RB's request.

C. The prosecution's motion to disqualify civilian counsel

At the initial pretrial session under Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), the prosecution moved to disqualify the civilian defense counsel, Mr. HG, based on allegations that he had attempted to bribe a prosecution witness. The prosecution also recommended disqualification of the other civilian counsel, Ms. C, who was engaged to Mr. HG and shared his law practice. In a subsequent investigation, the Army determined that the bribery allegations against Mr. HG were unsupported.

D. Replacement of civilian counsel

At the next Article 39(a) session, while the prosecution's disqualification motion was pending, the two civilian counsel moved to withdraw from representing Appellant. They also identified Mr. D, who was present as a spectator in the

courtroom, as the attorney who would replace them as Appellant's civilian counsel. After determining that Appellant agreed to the withdrawal of his civilian defense counsel, and that he intended to retain Mr. D, the military judge granted the motion by Mr. HG and Ms. C to withdraw.

### E. Defense request to remove military counsel

At the same session, Appellant asked the military judge to remove his military defense counsel, CPT RB, based on Appellant's assertion that CPT RB had revealed confidences to the prosecution. The military judge declined the request, noting that CPT RB was needed as a liaison between the new civilian defense counsel, Mr. D, and the remaining military defense counsel, CPT MC, neither of whom were located in the Fort Carson area. The military judge added, however, that he would reconsider Appellant's request to remove CPT RB after the other counsel had an opportunity to prepare for trial. In a subsequent proceeding, at the outset of the trial on the merits, the military judge specifically addressed the issue of whether Appellant wanted CPT RB to serve as his military defense counsel. Appellant responded that he wanted to retain CPT RB. The Army conducted a separate investigation into the allegation that CPT RB improperly revealed defense confidences and concluded that the allegation was unfounded.

## F.   Disagreements regarding trial strategy

During preparations for trial, the relationship between CPT MC and Mr. D deteriorated to the point where CPT MC filed a memorandum with the Regional Defense Counsel asserting that Mr. D was "incompetent and intend[ed]to represent the accused in a manner that [was] ineffective and unprofessional."  The memorandum primarily criticized Mr. D's intent to focus on what CPT MC viewed as unsubstantiated allegations of unlawful command influence and command-level drug abuse.  CPT MC stated that the unlawful command influence allegation initially was raised by Mr. HG, who apparently claimed that there was a conspiracy to frame Appellant.  CPT MC added that Mr. D improperly accepted the assertion that the entire case was infected with unlawful command influence without ascertaining the facts or considering the relevant principles of law.  CPT MC stated that he repeatedly told Mr. D that he did not agree with his assessment and repeatedly tried to focus Mr. D away from the conspiracy and onto the relevant issues of the case.  CPT MC viewed the unlawful command influence strategy as being dictated by Mr. D's friendship with the prior defense counsel, Mr. HG.

The memorandum also criticized Mr. D for delays in obtaining relevant files from Mr. HG.  CPT MC attributed the delay to Mr. D's unwillingness to press the issue in light of his friendship with Mr. HG.  According to CPT MC, Mr. D's

representation was marred by an inability to address the conflict between the duties to his client and his desire to vindicate his friend, Mr. HG.

The memorandum also expressed CPT MC's concern that Mr. D's performance reflected unfamiliarity with the military and military justice system. CPT MC stated he "repeatedly explained to [Mr. D] the procedure for obtaining expert assistance[,]" yet Mr. D failed "to acknowledge the necessary steps that needed to be taken to secure expert assistance." He also mentioned that Mr. D previously had been suspended from the practice of law based upon substance abuse and that CPT MC had heard unfavorable comments from a public defender familiar with Mr. D's practice. CPT MC concluded his memorandum with the notation: "I do not believe my efforts to focus [Mr. D] on the relevant issues of the case have been successful or will be successful in the future . . . . I believe further participation in this case could jeopardize CPT [RB's] and my good standing to practice law."

CPT MC asked the regional defense counsel to arrange either for the decertification of Mr. D or to permit the military defense counsel to withdraw from the case. The record does not reflect what action, if any, the regional defense counsel took in response to CPT MC's memorandum.

Ultimately, Mr. D was not decertified; neither CPT MC nor CPT RB asked the military judge for permission to withdraw; nor did they bring any of these matters to the attention of the military judge or Appellant.  The defense obtained expert assistance; Mr. HC transmitted the requested files to the defense; and the defense did not file any motions regarding unlawful command influence or command-level drug abuse.

G.    Evidence on the merits presented by the prosecution

During Appellant's trial, the prosecution introduced evidence concerning two convenience store robberies that occurred on the same day, each committed by a male pretending to have a concealed firearm.  The prosecution presented evidence that each of the robberies was committed by Appellant, including recorded surveillance videos and the testimony of employees working at the convenience stores at the time of the robberies. Additionally, Private (PVT) D, a fellow servicemember and friend of Appellant, identified the robbery perpetrator in the surveillance videos as Appellant.  PVT D also stated that the person in the videos was wearing a jacket he had loaned to Appellant.

With respect to the rape charge, the prosecution presented the testimony of Ms. P, who provided details of the charged offense and identified Appellant as the perpetrator.  Ms. P

testified that she received a call from a man who said that he was from her husband's unit. Shortly thereafter, the man came to her apartment and said that Ms. P's husband had spoken to him about needing automobile insurance. During their conversation, she became uncomfortable with the situation and asked him to leave. He refused and raped her while her five-month old son was nearby. In the course of leaving the apartment, he told her that if she reported the incident her husband would lose his job and she would lose her family. The sexual assault nurse who examined Ms. P testified that the results of the examination were consistent with rape.

A friend of Ms. P, who lived in the same apartment complex, provided testimony of a similar incident on the same day. She testified that a man called her, identified himself as from her husband's unit, and then came to her apartment. She did not let him in. Later in the day, while at a gas station, a man approached her and said that he had been at her apartment earlier. She subsequently reported the incident to the police, provided a description of the man similar to the description given to the police by Ms. P, and identified Appellant as this man.

A DNA expert testified that there was a positive match between Appellant's DNA and the sperm extracted from Ms. P during her sexual assault exam. The expert stated that a

positive match between the two samples would only occur in "1 in 4 million 500 thousand African-Americans; 1 in 5 million 300 thousand Caucasians; and 1 in 1 million 900 thousand Southwestern Hispanics."

### H.    The defense position on the merits

The defense endeavored to convince the court-martial that Appellant was not the perpetrator of the robberies or of the rape.  The defense raised the possibility that another soldier from Appellant's unit, Private First Class JJ -- who bore a strong resemblance to Appellant -- committed the crimes.  The defense also offered an alibi defense through the testimony of a coworker that Appellant was at work at the time Ms. P was raped.

The defense challenged the reliability of the evidence identifying Appellant as the perpetrator of the charged crimes. The defense sought to undermine the testimony of the convenience store employees on the grounds that their identification testimony was biased and tainted.  The defense challenged the identifications of Appellant by Ms. P and her friend on grounds that the photo lineup was biased and the identifications were tainted by the discussion of the lineup between Ms. P and her friend.  The defense also sought to demonstrate that Ms. P's identification was further tainted by a discussion that she had with her husband regarding Appellant's presence in the lineup.

11

The defense challenged the testimony of PVT D, who had identified Appellant on the convenience store's surveillance videotapes. According to the defense, PVT D was biased, and was trying to protect himself from prosecution. The defense noted that PVT D had tested positive for cocaine, and, at one point, had been considered a suspect for the charges facing Appellant.

The defense also challenged the DNA evidence, focusing on Appellant's origins in the Virgin Islands. According to the defense, the DNA database maintained by the FBI did not provide an accurate basis for matching the DNA of Appellant because Appellant came from a subpopulation not proportionately represented in the database.

## II. CONFLICTS OF INTEREST

### A. Standard of review

In the first granted issue, Appellant asserts that his attorneys labored under conflicts of interest, and that these conflicts resulted in the denial of his constitutional right to the effective assistance of counsel. U.S. Const. amend. VI. In particular, Appellant claims his counsel had the following conflicts: CPT RB leaked confidential defense information; Mr. HG and Ms. C were more concerned with allegations of bribery than with his case; CPT MC placed his concern for his license over his loyalty to Appellant; and Mr. D placed his friendship

12

with Mr. HG and Ms. C over his duty to Appellant.  We review such claims de novo.  See United States v. Key, 57 M.J. 246, 249 (C.A.A.F. 2002).

An appellant "who seeks to relitigate a trial by claiming ineffective assistance of counsel must surmount a very high hurdle."  United States v. Moulton, 47 M.J. 227, 229 (C.A.A.F. 1997).  Such an appellant must demonstrate:  (1) a deficiency in counsel's performance that is "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) that the "deficient performance prejudiced the defense . . . [through] errors . . . so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at 229 (quoting Strickland, 466 U.S. at 687).  If we conclude that any error would not have been prejudicial under the second prong of Strickland, we need not ascertain the validity of the allegations or grade the quality of counsel's performance under the first prong.  466 U.S. at 697.  See also United States v. McConnell, 55 M.J. 479, 481 (C.A.A.F. 2001).

Conflicts of interest, like other actions by an attorney that contravene the canons of legal ethics, do not necessarily demonstrate prejudice under the second prong of Strickland.  See Mickens v. Taylor, 535 U.S. 162, 175-76 (2002); Nix v. Whiteside, 475 U.S. 157, 165 (1986).  Although cases involving

13

concurrent representation of multiple clients have been treated as inherently prejudicial, see Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980), "'not all attorney conflicts present comparable difficulties,' and . . . most cases will require specifically tailored analyses in which the appellant must demonstrate both the deficiency and prejudice under the standards set by Strickland." United States v. Cain, 59 M.J. 285, 294 (C.A.A.F. 2004) (quoting Mickens, 535 U.S. at 175-76).

Appellate courts have applied varying approaches to the question of whether a conflict of interest should be viewed as inherently prejudicial if the conflict does not involve multiple representation. Compare United States v. Hearst, 638 F.2d 1190, 1193 (9th Cir. 1980) (applying an inherent prejudice standard to a conflict arising outside a multiple representation situation), with Beets v. Sullivan, 65 F.3d 1258, 1265-66 (5th Cir. 1995) (applying the Strickland standard to a conflict arising outside the multiple representation situation). Under our precedents, the question of whether there is inherent prejudice in a conflict between the self-interest of an attorney and the interests of the client must be assessed on a case-by-case basis. In United States v. Babbitt, 26 M.J. 157 (C.M.A. 1988), for example, we concluded that a conflict involving sexual relations during trial between a male civilian attorney and his

14

married female military client should be tested for actual prejudice, and we determined that there was no prejudice.

In Cain, 59 M.J. at 295, we focused on the specific circumstances of the case -- a homosexual relationship between a military attorney and a military client, "involving an attorney's abuse of a military office, a violation of the duty of loyalty, fraternization, and repeated commission of the same criminal offense for which the attorney's client was on trial," all of which was left unexplained as a result of defense counsel's suicide, which occurred shortly after being questioned about these matters by a superior. In light of those factors, we concluded that "[t]he uniquely proscribed relationship before us was inherently prejudicial and created a per se conflict of interest . . . ." Id. The present case does not involve the unusual combination of factors that led us to determine in Cain that the conflicts were inherently prejudicial. Under these circumstances, we conclude that the present case should be reviewed for specific prejudice under Strickland.

## B. Potential conflicts of interest

Appellant has identified a number of potential conflicts between the self-interests of his attorneys and his interests as their client. Under Strickland, identification of a potential deficiency is not sufficient. To surmount the high hurdle presented by the second prong of Strickland, an appellant must

15

demonstrate specific prejudice. In the present case, Appellant has not done so because he has not demonstrated that any of the potential conflicts described below developed into deficiencies so serious as to deprive him of a fair trial, that is, a trial whose result was reliable. See Strickland, 466 U.S. at 687.

1. CPT RB

Appellant originally moved to remove CPT RB based on a belief that she had revealed confidences in Appellant's case to trial counsel. According to Appellant, CPT RB was conflicted because the accused thought she had committed an ethics violation. Prior to trial on the merits, however, Appellant decided not to pursue this course of action, and affirmatively advised the military judge that he wished to retain CPT RB as counsel. A subsequent Army investigation found that the allegation of improper disclosure was unsupported. The results of that investigation, which have not been challenged by Appellant, are consistent with Appellant's decision to retain CPT RB as counsel.

2. Mr. HG and Ms. C

Appellant contends that Mr. HG and Ms. C were conflicted as a result of the allegation that Mr. HG had attempted to bribe a witness. After the Government made the allegation, however, both counsel withdrew from Appellant's representation. The allegation against Mr. HG subsequently was found to be

16

unsupported. Mr. HG and Ms. C did not abandon Appellant, but instead assisted him in obtaining new civilian counsel, Mr. D. At that time, Appellant was represented by two military counsel, CPT RB and CPT MC, as well as having a new civilian defense counsel recommended by Mr. HG and Ms. C.

3. CPT MC -- Trial strategy

Relying on a pretrial memorandum sent by CPT MC to the Regional Defense Counsel, Appellant contends that CPT MC's interest in his professional standing conflicted with his duty of loyalty to Appellant. Appellant also contends that CPT MC violated his duty of loyalty by not informing Appellant of these concerns. In the memorandum, CPT MC requested the decertification of Mr. D and asserted that his reputation would suffer from association with Mr. D. The primary substantive issue in the memorandum concerned CPT MC's assertion that Mr. D intended to pursue an unsubstantiated allegation of unlawful command influence. At trial, however, the defense did not raise the issue of unlawful command influence, focusing instead on the merits of the prosecution case. These circumstances indicate that the concerns of CPT MC were resolved prior to trial. The record does not otherwise demonstrate that CPT MC was unsuccessful in properly focusing the efforts of the defense team. Absent evidence demonstrating that he was unable to resolve his initial concerns about Mr. D, CPT MC was not

17

obligated to communicate those initial concerns to Appellant. See Dep't of Army, Military Justice, Army Reg. 27-10 app. C-2 b.(3) (Apr. 27, 2005) (indicating that military counsel is obligated to only inform the client of problems with civilian counsel's tactics only if the problems cannot first be resolved between counsel).

4.   CPT MC -- Information about Mr. D

Appellant also notes that CPT MC did not inform him of the concern, raised in CPT MC's letter to the Regional Defense Counsel, that Mr. D's license to practice law previously had been suspended.  At the time of trial, however, Mr. D was licensed to practice law.  Appellant does not identify a specific obligation on the part of co-counsel to inform a client about a past disciplinary action against the lead counsel who, at the time of trial, was licensed to practice law.  Even if CPT MC had been under such an obligation, Appellant has not identified the details of the past disciplinary action against Mr. D.  As such, we have nothing more than speculation as to the impact that any such information might have had on Appellant's rights under Strickland.

5.   Mr. D

Appellant contends that Mr. D faced a conflict between his friendship with Appellant's prior counsel, Mr. HG, and his duty

of loyalty to Appellant.  In particular, Appellant claims that Mr. D was reluctant to press Mr. HG for files necessary to prepare for trial motions because of their friendship.  The record, however, reflects that the documents were turned over to the defense counsel, and that pertinent motions were filed and argued by the defense at trial.  Even assuming that there was some delay in obtaining the records, whether as a result of Mr. D's reluctance or for some other reason, Appellant has not demonstrated that any such delay had any effect on the trial proceedings.

### III. ISSUES CONCERNING PERFORMANCE OF COUNSEL

Aside from the concerns related to potential conflicts of interest, Appellant alleges a number of deficiencies in the performance of his attorneys.  We review these contentions under the Strickland test, discussed in Section II.B., supra.  When we apply Strickland to the alleged deficiencies in performance, we ask the following questions:

> 1.  Are the allegations made by appellant true; and, if they are, is there a reasonable explanation for counsel's actions in the defense of the case?
>
> 2.  If they are true, did the level of advocacy "fall[] measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3.  If ineffective assistance of counsel is found to exist, "is . . . there . . . a reasonable probability

> that, absent the errors, the factfinder would have
> had a reasonable doubt respecting guilt?"

McConnell, 55 M.J. at 481 (quoting United States v. Polk, 32

M.J. 150, 153 (C.M.A. 1991)).

In this appeal, Appellant identifies a number of specific problems with the performance of his counsel. First, Appellant contends that his military counsel were deficient in not bringing to his attention their concerns about the manner in which Mr. D performed his duties as counsel. We have addressed this matter in Section II, supra.

Second, Appellant contends that Mr. D was unfamiliar with military practice, which led to difficulties in presenting motions, preserving challenges, compiling witness lists, addressing Military Rule of Evidence 412, providing notice of an alibi defense, obtaining expert witnesses, and participating in sidebar conferences. Appellant's contention consists of a list of alleged deficiencies and he does not detail how these matters relate to the substantive issues at trial.

Third, Appellant contends that defense counsel erroneously opened the door to negative testimony during the cross-examination of PVT D. During the prosecution's case-in-chief, PVT D testified in connection with the rape charge, stating that Appellant often used a fake name. The testimony of PVT D aided the prosecution by corroborating the assertions of Ms. P and Ms.

H, who testified that Appellant used a false name during his initial contact with them on the day of the rape. During cross-examination, defense counsel attempted to impeach PVT D by showing that he had a motive to lie so he could avoid prosecution for drug abuse. In response to this line of questioning, the prosecution during redirect examination elicited testimony from PVT D that his cooperation with the Government did not stem from potential drug charges, but because Appellant's former counsel had tried to bribe him. Appellant contends that this negative testimony emerged because defense counsel erroneously opened the door during cross-examination of PVT D about his motives. In addition, Appellant contends that his counsel erred by asking a question which led PVT D to state that one of the false names used by Appellant was "Mike Robinson," which enabled the prosecution to link PVT D's testimony to Ms. P and Ms. H's statements that Appellant had used a similar fake name during his encounters with them.

Fourth, Appellant contends that his counsel failed to exploit inconsistencies between Ms. P's testimony at trial and her pretrial statements. At trial, Ms. P testified that the rape occurred in front of the TV in the living room and that her assailant unbuttoned his pants. Appellant contends that defense counsel could have cast doubt on her testimony by questioning her about pretrial statements in which she said that the rape

occurred in the bedroom and that her assailant had unzipped his pants.

Fifth, Appellant contends that his counsel erred by not asking the husband of Ms. P to testify as to her character for untruthfulness. Appellant also asserts that the defense could have more aggressively exploited the husband's testimony that he had an advance view of the photo lineup and discussed it with her before she identified Appellant.

The Government takes the position that the defense team prevailed on a variety of motions, offered an aggressive defense both through cross-examination and direct presentation of witnesses, made reasonable strategic choices regarding the examination of PVT D, Ms. P, and her husband, that any alleged deficiencies involved evidence that was peripheral or cumulative, and that any other deficiencies were not outside the range of performance covered by either the first or second prong of Strickland.

The primary evidence against Appellant consisted of the forensic evidence matching his DNA to the sperm extracted from Ms. P during her sexual assault exam. According to the prosecution's expert witness, this match would occur only in 1 in 4,500,000 African-Americans; 1 in 5,300,000 Caucasians; and 1 in 1,900,000 Southwestern Hispanics. In addition, the prosecution connected Appellant to the convenience store

robberies through direct testimony and the video surveillance tapes.  Appellant has not demonstrated that any of the deficiencies raised in this appeal would have altered the powerful import of the DNA and identification evidence in establishing Appellant's guilt.  Under these circumstances, we need not determine whether any of the alleged errors established constitutional deficiencies under the first prong of Strickland, because any such errors would not have been prejudicial under the high hurdle established by the second prong of Strickland.

## IV. CONCLUSION

The decision of the United States Army Court of Criminal Appeals is affirmed.