*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Jayson W. GRANT**
*Chief Operations Specialist (E-7), U.S. Navy*
*Appellant*

**No. 201900212**

Decided: 25 January 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Arthur L. Gaston III

Sentence adjudged 12 February 2019 by a general court-martial convened at Naval Support Activity Naples, Italy, consisting of a military judge alone. Sentence approved by the convening authority: confinement for four years and a dishonorable discharge.

For Appellant:
*Bethany L. Payton-O'Brien, Esq.*
*Lieutenant Daniel O. Moore, JAGC, USN*

For Appellee:
*Lieutenant Jennifer Joseph, JAGC, USN*
*Lieutenant Joshua C. Fiveson, JAGC, USN*

Chief Judge MONAHAN delivered the opinion of the Court, in which Senior Judge STEPHENS and Judge DEERWESTER joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

MONAHAN, Chief Judge:

Appellant was convicted, consistent with his pleas, of one specification of attempted sex trafficking[1] and one specification of attempted labor trafficking in violation of Title 18, United States Code [U.S.C.],[2] assimilated under Article 134 of the Uniform Code of Military Justice [UCMJ].[3]

Appellant raises four assignments of error [AOEs]:[4] (1) Appellant's guilty pleas were improvident because his actions did not reflect a substantial step towards the commission of the target offenses and the record does not reflect the use of fraud or coercion; (2) trial defense counsel [TDC] provided ineffective assistance of counsel by his failure to explore possible Article 13, UCMJ, credit based upon pretrial events and conditions, and because TDC's involvement in the Naval Criminal Investigative Service [NCIS] investigation in Bahrain caused a conflict of interest that he was required to disclose to Appellant; (3) Appellant's sentence was inappropriately severe;[5] and (4) Appellant's guilty plea was involuntary because he was not advised by

---

[1] After accepting Appellant's pleas and finding him guilty of two specifications of sex trafficking under different theories of criminal liability, the military judge sua sponte merged these two specifications to remedy an unreasonable multiplication of charges.

[2] Sex trafficking is an offense under 18 U.S.C. § 1591 (2012). Labor trafficking is an offense under 18 U.S.C. § 1590 (2012). An attempt to commit either offense is punishable under 18 U.S.C. § 1594 (2012).

[3] 10 U.S.C. § 934 (2012).

[4] We have renumbered and, with regard to Appellant's ineffective assistance of counsel claims, combined Appellant's AOEs.

[5] This assignment of error subsumes an AOE raised by a different military appellate defense counsel who represented Appellant before he hired civilian appellate defense counsel and obtained representation by his current military appellate defense counsel.

TDC that a conviction for sex trafficking would require sex offender registration.[6] We find no prejudicial error and affirm.

# I. BACKGROUND

## A. Substance of Appellant's Offenses

### 1. Appellant and Jamie plan a financial enterprise

While stationed in Bahrain, Appellant maintained an account on Tinder, a dating application that "matches" users when both users view each other's profiles and affirmatively indicate that they want to exchange messages with each other. In September 2017, an NCIS Special Agent posing as a woman named "Jamie" began a Tinder conversation with Appellant. After Jamie indicated that she was a prostitute, Appellant asked if she knew anyone who needed a room to rent and that he had one available. Jamie responded that she could get a woman from Thailand to live with him, and that the woman could make money for him. When Appellant inquired how much money the woman could make and when she could start, Jamie answered that she needed to "procure" a Thai woman, the woman could make as much as 120 Bharani Dinar [BD] ($318) per night, that he could hold the woman's passport and the woman would stay with him.

Appellant and Jamie further developed their plan by taking their text conversation from Tinder to WhatsApp, another application that allows users to send text messages. During the course of their conversation on WhatsApp, Appellant and Jamie discussed a plan whereby Jamie would import three Thai women into Bahrain and he would house them. The women would work in Bahrain as prostitutes, and Appellant would receive a portion of their daily earnings. Specifically, Jamie told Appellant, "They Do sex and make u Money."[7] Jamie also told Appellant, "U have their passport so they work as long as u want."[8] When Appellant asked Jamie when they could start this venture, she replied, "Very soon . . . Boss will traffic girls here to Bahrain."[9] During the course of the conversation, Appellant said that the Thai women

---

[6] This AOE was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have reviewed this assigned error and find it to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

[7] Pros. Ex. 1 at 26.

[8] *Id.* at 29.

[9] *Id.* at 29-30.

would also need to clean his house. When Appellant reiterated his question when they could begin, Jamie said, "Can u meet with Boss next Week? That is last step[.] He just need to See u before purchasing girls[.]"[10] After Appellant asked Jamie if she was "law enforcement or affiliated with law enforcement"[11] and she said no, he agreed to meet with "the Boss."[12]

### 2. *Appellant discusses details of the enterprise with "the Boss"*

In early October 2017, Appellant met with an undercover NCIS Special Agent, who pretended to be Jamie's boss "C.A.," at a bar located in Manama, Bahrain, and who surreptitiously recorded the meeting.[13] The purpose of this meeting was for Appellant to discuss details of the enterprise to harbor Thai women and to profit from their commercial sex acts, as well as to confirm Appellant's intent to participate in this venture. During their conversation, C.A. confirmed that in exchange for housing the three Thai prostitutes, Appellant would receive half their earnings, be entitled to have sex with the prostitutes whenever he wanted, and have the women cook for him and clean his apartment. C.A. also assured Appellant that he [Appellant] would hold the women's passports, meaning that Appellant could control the women by refusing to allow them to have the means to leave Bahrain or otherwise engage in international travel. C.A. further explained that Jamie would text Appellant each night to report his expected share of the women's earnings from the evening. Additionally, Appellant could designate a place for the women to place his earnings if he was asleep or not at home. At the end of their conversation, C.A. told Appellant that Jamie would contact him and let him know what time the next day that she would be dropping off the three Thai prostitutes to Appellant's house. Appellant replied, "Okay cool."[14]

---

[10] *Id.* at 32.

[11] *Id.* at 33.

[12] Screenshots of all relevant WhatsApp text conversations between Appellant and Jamie were appended as enclosures to the stipulation of fact, Prosecution Exhibit 1.

[13] A transcript of this recording was appended as an enclosure to the stipulation of fact, Prosecution Exhibit 1. A copy of the recording itself was admitted as Prosecution Exhibit 8.

[14] Pros. Ex. 1 at 19.

*3. Appellant confirms with Jamie his intent to execute enterprise*

After meeting with C.A., Appellant texted Jamie thanking her for arranging the meeting and indicated he wanted to move forward with the plan. Their exchange was as follows:

Appellant: Thank you for the meet with CA.

Jamie: No problm, u want me to Drop them off at ur place tomorrow

Appellant: Yes. And tomorrow when we meet I have some more business to talk to you about. With more girls.

Jamie: No problm ur friends need girls too?

Jus let US know

Appellant: Yes

Jamie: No problm easy, u can give me their numbers

Make Sure u get money for referral

Appellant: What time will my girls be in?

Who do I get the referral money from?

My friend says he wants 2 girls and they could move in as soon as possible.

Jamie: Very good, Ca will be happy. I will get you Referat Money

Wat ur address for later?

Appellant: [Provides his address.]

Around what time will you be able to drop them off and do they know what is expected of them.

Jamie: U let me know when u off work and I bring them

They know but be firm u know? They know they belong to u

Appellant: Ok. Sounds like a plan.

Also can you let them know that you will be sending me a text letting me know how much they will owe me each night and that if I am not home to just slide the

money under my bedroom door when they get in from
work.

    Jamie:   Yes[15]

## B. Trial Defense Counsel

In a sworn, post-trial declaration, Appellant made a number of assertions about his TDC, Lieutenant Commander [LCDR] Bravo.[16]

*1. Appellant's assertions concerning LCDR Bravo and the NCIS sex trafficking sting operation*

According to Appellant, in the spring of 2018, while assigned in Norfolk, Virginia, awaiting his court-martial, Appellant learned from other Sailors under investigation by NCIS, that LCDR Bravo was flagged in an NCIS investigation. Specifically, he learned that LCDR Bravo had a Tinder profile during the relevant period of Appellant's misconduct in Bahrain, and NCIS tried to connect with LCDR Bravo during their Bahrain sex trafficking sting operation. Appellant asserted that LCDR Bravo did not inform him about his role in the NCIS investigation and did not give him any information as to why his name was included in an NCIS investigation.

Appellant's civilian appellate defense counsel learned during her post-trial investigation that LCDR Bravo had been contacted via Tinder by NCIS agents posing as a prostitute during their sting operation. Appellant's civilian appellate defense counsel also spoke to Captain [CAPT] Charlie, the Fifth Fleet staff judge advocate, who said that he reviewed a report that mentioned LCDR Bravo but that CAPT Charlie never provided the report to LCDR Bravo's chain of command or to LCDR Bravo himself. CAPT Charlie told civilian appellate defense counsel that he believed the report was a "General Criminal" investigative report and not a report in which Appellant was named as the subject. CAPT Charlie advised civilian appellate defense counsel that a copy of this report was provided to the trial counsel in Appellant's case.

Civilian appellate defense counsel explained the potential conflict issue concerning LCDR Bravo to Appellant while he was in the brig after trial. After receiving this explanation, Appellant made several assertions concern-

---

[15] *Id.* at 44-47.

[16] All names in this opinion, other than those of Appellant, the judge, and appellate counsel, are pseudonyms.

ing LCDR Bravo. He claimed that he was sure he would not have agreed to keep LCDR Bravo as his counsel if he had known at the time the full extent of the issue. Appellant further stated that looking back on the case, LCDR Bravo consistently pressured Appellant to plead guilty, and Appellant did not feel LCDR Bravo was fully on his side. LCDR Bravo—again, according to Appellant—gave the impression there was no other option than to take the Government's offered deal because it was the best thing to do with the least collateral damage. According to Appellant, LCDR Bravo eventually told Appellant the decision whether to go to trial was ultimately up to Appellant himself. LCDR Bravo further told Appellant that he would lose all his bene-fits and be a felon, but never mentioned to Appellant the possibility that he might have to register as a sex offender or participate in any treatment programs.

Appellant avers that had he been informed about the conflict with LCDR Bravo as his counsel or fully understood the issue at the time of his trial, he would not have agreed to LCDR Bravo remaining as his detailed military counsel, because his name was in a NCIS report and he had been contacted by undercover NCIS agents on Tinder during their sex trafficking sting in Bahrain. Other Sailors had similar cases arising out of Bahrain, and none were represented by LCDR Bravo. Although their cases were "more damning,"[17] with victims or witnesses, all received more favorable outcomes at their trials than Appellant, whose case only involved undercover agents.

Appellant further asserted that, although the trial counsel was in posses-sion of the NCIS report, which included LCDR Bravo's name or title, LCDR Bravo was never provided the NCIS report that named him as a potential target of their Tinder sting. As a result of never seeing or reviewing the report, Appellant does not know the details of the communications NCIS had with LCDR Bravo on Tinder during their sting. Appellant's civilian appellate defense counsel also interviewed the commanding officer and senior defense counsel of the Defense Service Office to which LCDR Bravo was assigned. Neither was in possession of the NCIS report naming LCDR Bravo as a person who was contacted by NCIS on Tinder during the sting, nor had they reviewed it prior to making a determination about any potential conflict of interest related to LCDR Bravo's representation of Appellant. To Appel-lant's knowledge, LCDR Bravo did not file a motion to compel the NCIS report that included his name. Trial counsel did not respond to civilian

---

[17] Appellant's Mot. to Attach, encl. (Declaration of Appellant, July 2, 2020).

appellate defense counsel's emails on this issue aimed at obtaining a copy of the NCIS report that contained LCDR Bravo's name or title.

*2. Appellant's assertions concerning LCDR Bravo's failure to pursue a motion for illegal pretrial punishment*

In Appellant's declaration, he also asserts that various adverse actions were taken against him prior to trial and that his TDC never advised him that he could pursue an Article 13, UCMJ, motion for illegal pretrial punishment. According to Appellant, in October 2017, after the NCIS investigation involving him came to light, he was placed on Class "B" liberty risk, despite no evidence that he had committed any further misconduct. This liberty risk status entailed restrictions against leaving base, a requirement to travel to and from duty without any stops except for grocery shopping or attending church, a phone muster when he returned to his room at night, face-to-face musters at 0800 and 2200 on non-duty days, and the requirement to remain in his room in between the two musters. Appellant's command prohibited him from purchasing alcohol and confiscated his passport. These liberty risk conditions remained in place until November or December 2017, despite no pending charges.

In mid-January 2018, Appellant's leave request was approved. However, shortly afterwards, Commander, U.S. Navy Forces, Central Command [COMNAVCENT] conducted an all hands call and gave a speech regarding the investigations into Sailors in Bahrain engaged in sex trafficking. Within a few days of COMNAVCENT's visit, Appellant was told that his leave request was now denied.

In mid-February 2018, Appellant was informed that he was being placed onto Class "C" liberty risk status, and that "the Admiral" had made this decision.[18] Appellant did not know the reason for this change because there had been no problems since he had been removed from liberty risk in November or December 2017. This elevated liberty risk status imposed even further restrictive conditions. Appellant was again not allowed off base and was required to participate in a face-to-face muster at 0730 on duty days. He was then required to participate in face-to-face musters at 1600 and 2000, and

---

[18] In his sworn declaration, Appellant did not specify the admiral to which he was referring. We infer that he was referring to COMUSNAVCENT, who was not the convening authority in this case, and is not in the chain of command of Commander, Navy Region Europe, Africa, Southwest Asia, the flag officer who did serve as the convening authority.

upon return to his room after the 2000 face-to-face muster, to conduct a telephone muster. On non-duty days, he was required to participate in face-to-face musters at 0730 and 2000 and again after returning to his room following the 2000 face-to-face muster. Appellant remained in Class "C" liberty risk until after charges were preferred against him in mid-March 2018.

After charges were preferred, Appellant was transferred to Transient Personnel Unit Norfolk, Virginia. There, he was assigned duties not commensurate with his paygrade, such as trash cleanup, stripping and waxing floors, cutting grass and other lawn maintenance, and painting and construction projects. All of these duties were performed under the supervision of petty officers in pay-grades E-5 and E-6. These circumstances continued until his trial in February 2019, almost one year later.

Appellant provided LCDR Bravo copies of his liberty risk/restriction orders soon after he received them. However, LCDR Bravo never advised Appellant that he could file a motion for confinement credit under Article 13, UCMJ, for illegal pretrial punishment.

## II. DISCUSSION

### A. Appellant's Guilty Pleas Were Provident

*1. Standard of review and the law*

The standard of review in determining whether a guilty plea is provident is whether the record provides a substantial basis in law and in fact to question it.[19] A guilty plea must be supported by a sufficient factual basis.[20] In determining whether a guilty plea is provident, the military judge may consider the facts contained in the stipulation of fact along with the inquiry of Appellant on the record.[21]

18 U.S.C. §§ 1590-91 outlaw labor and sex trafficking, respectively, by force and other prohibited means. 18 U.S.C. § 1594 provides that an attempt to violate either § 1590 or § 1591 shall be punishable in the same manner as a completed violation.

---

[19] *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991).

[20] *United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

[21] *United States v. Whitaker*, 72 M.J. 292, 293 (C.A.A.F. 2013).

An attempt requires both an intent to commit the predicate offense, and a "substantial step" toward its completion.[22] A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime.[23] As the United States Court of Appeals for the Eighth Circuit has explained:

> In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute.[24]

The Court of Appeals for the Armed Forces has distinguished an attempt as going beyond "devising or arranging the means or measures necessary for the commission of an offense," and instead, engaging in a "direct movement toward the commission after preparations are made."[25]

### 2. Appellant took substantial steps toward the commission of the offenses

Appellant contends that there is a substantial basis in law and fact to question the military judge's acceptance of his pleas of guilty. Specifically, he asserts that his action in meeting with C.A. did not amount to a substantial step towards the commission of the offenses of sex or labor trafficking. Rather, he argues that his meeting with C.A. was for the purpose of merely continuing to arrange the means or measures necessary for the commission of the offense, and that his conversation with the undercover agent demonstrates that preparations to commit the offenses at issue were still ongoing.

We find Appellant's argument on this issue to be unpersuasive. As contained in the transcript of the recording of the meeting between Appellant and C.A., whom Appellant understood to be "the Boss" in a sex trafficking scheme, they discussed in depth myriad details on how the scheme would work. Specifically, they agreed that three women would be brought from Thailand to work as prostitutes in Bahrain, that these women would live in Appellant's apartment, and that he would receive half of their nightly earn-

---

[22] *United States v. Larive*, 794 F.3d 1016, 1019 (8th Cir. 2015).

[23] *Id.*

[24] *Id. (quoting United States v. Mims*, 812 F.2d 1068, 1077 (8th Cir. 1987)).

[25] *United States v. Hale*, 78 M.J. 268, 271 (C.A.A.F. 2019) (*quoting United States v. Schoof*, 37 M.J. 96, 103 (C.M.A. 1993)).

ings from prostitution. They discussed that the women would also cook for Appellant and clean his apartment, and that Appellant would hold the women's passports so that he could exercise control over them. C.A. further told Appellant that Jamie would text Appellant each night to tell him how much money to expect from the women for his share of their night's earnings as a prostitute, and that Appellant could designate a place for the women to place his earnings if he was asleep or not at home. At the end of their conversation, C.A. told Appellant that Jamie would contact him and let him know what time the next day that she would be dropping off the three Thai prostitutes to Appellant's house. To this, Appellant replied, "Okay cool."[26] Under these circumstances, we find Appellant's discussion with C.A., culminating with Appellant giving C.A. the green light to commence the sex / labor trafficking enterprise after discussing all the salient details with him, to be more than mere preparation. Indeed, it was a direct movement towards the commission of the offenses after preparations were made.

Assuming, *arguendo*, that Appellant did not take a substantial step towards commission of the offenses at the end of his conversation with C.A., he certainly did so shortly thereafter when he texted Jamie to thank her for setting up the meeting with C.A. During that text conversation, which is also attached as an enclosure to the stipulation of fact, Appellant explicitly agreed to have Jamie drop the three Thai women off at his apartment the next day so that they could begin the sex / labor trafficking enterprise. Additionally, Appellant asked Jamie to ensure the women knew that she would be sending him a nightly text with how much they would owe him, and providing instructions that if he was not home, "to just slide the money under [his] bedroom door when they get in from work."[27] Without question, Appellant's actions during this conversation constitute him engaging in a direct movement toward the commission of the offenses at issue after preparations had been made.[28] Therefore, there is no substantial basis in law or in fact to question the military judge's acceptance of Appellant's pleas of guilt.[29]

---

[26] Pros. Ex. 1 at 19.

[27] *Id.* at 47.

[28] Our conclusion is consistent with civilian federal case law that has found online conversations with undercover agents or actual minors sufficient to satisfy the substantial step element for the offenses of attempted sex trafficking, *see, e.g.*, *United States v. Larive*, 794 F.3d 1016, 1019 (8th Cir. 2015) (appellant's online conversation with an adult to arrange sex with a minor and travel to an arranged place to meet a minor each constitute substantial steps); *United States v. Brinson*, 772 F.3d 1314, 1326-27 (10th Cir. 2014) (appellant's Facebook discussion with actual minor consti-

## B. Appellant Fails to Establish Ineffective Assistance of Counsel

### 1. Standard of review and the law

We review claims of ineffective assistance of counsel de novo.[30] In *Strickland v. Washington*,[31] the Supreme Court laid out the test that guides our analysis. In order to prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[32] The Appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[33] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."[34]

Conflicts of interest do not necessarily demonstrate prejudice under *Strickland's* second prong.[35] But when an appellant can show "that a conflict of interest actually affected the adequacy of his representation, [he] need not demonstrate prejudice in order to obtain relief."[36]

---

tutes a substantial step), and attempted enticement of minors to engage in sexual activity, *see, e.g., United States v. Spurlock*, 495 F.3d. 1011, 1014 (8th Cir. 2007) (appellant's online and telephone conversations with undercover agent satisfied substantial step element).

[29] To the extent that Appellant's AOE asserts that the record does not reflect the use of fraud or coercion in the sex / labor trafficking enterprise, due to the fact that the scheme entailed Appellant holding on to the women's passport so that he could control them, we summarily reject Appellant's argument. *See Matias*, 25 M.J. at 363.

[30] *United States v. Harpole*, 77 M.J. 231, 236 (C.A.A.F. 2018).

[31] 466 U.S. 668 (1984).

[32] *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687).

[33] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008), *aff'd*, 556 U.S. 904, (2009).

[34] *Strickland*, 466 U.S. at 697.

[35] *United States v. Saintaude*, 61 M.J. 175, 180 (C.A.A.F. 2005).

[36] *Cuyler v. Sullivan*, 446 U.S. 335, 349-50, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) (citation omitted); *see also United States v Hale*, 76 M.J. 713, 722 (N-M. Ct. Crim. App.) (holding that an appellant is entitled to presumption of prejudice where his counsel labored under an actual conflict of interest, and where the conflict had an adverse effect on the counsel's performance), *aff'd*, 77 M.J. 138 (C.A.A.F. 2017).

A potential conflict exists if the interests of an accused may place the defense counsel under inconsistent duties at some time in the future.[37] Such potential conflicts of interest include purely speculative allegations of conflict, which warrant no presumption of prejudice.[38] An actual conflict is a necessary but insufficient prerequisite to benefit from a presumption of prejudice.[39] A conflict of interest is actual, as opposed to potential, when, during the course of the representation, "the attorney's and [accused's] interests diverge with respect to a material factual or legal issue or to a course of action."[40]

*2. Appellant fails to demonstrate prejudice with regard to a potential motion brought under Article 13, UCMJ*

In this case we need not determine whether the TDC's performance was deficient with regard to a potential motion for confinement credit due to illegal pretrial punishment. Even assuming *arguendo* deficient performance, Appellant fails to demonstrate prejudice. After agreeing in online conversations with one undercover NCIS agent and an in-person, recorded meeting with another to participate in a sex / labor trafficking venture, Appellant faced a very strong case against him with enormous punitive exposure—including a maximum of confinement for life. His TDC successfully negotiated a pretrial agreement that would suspend any adjudged confinement in excess of five years, and then presented a strong sentencing case, which resulted in Appellant "beating the deal" by receiving an adjudged sentence that included only four years of confinement.

As consideration to enter into this pretrial agreement, TDC tendered an offer that included a provision to waive all motions except those that were otherwise non-waivable.[41] During the military judge's discussion with Appellant about this term of his pretrial agreement, the military judge and TDC had the following colloquy:

> TDC: Sir, if I could just add in relation to this paragraph, it's a pretty standard paragraph in a PTA. In drafting the PTA I wanted to draft one that was likely to be accepted.

---

[37] *Hale*, 76 M.J. at 722.

[38] *Id.*

[39] *Id.*

[40] *Id.* (*quoting United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003)).

[41] R. at 146.

MJ:   No, I understand that. It's been in every PTA that I have ever seen.

TDC:   I think the government would have required it if I had not drafted it in the PTA.[42]

We are somewhat concerned that TDC apparently neither discussed a potential Article 13, UCMJ, motion with Appellant, nor indicated he considered raising such a motion when asked by the military judge on the record. However, in the end we cannot find any prejudice from TDC's inaction. Specifically, we agree with TDC's assertion on the record that it would have been very unlikely in this case that the Government would have positively endorsed and the convening authority would have agreed to allow Appellant to enter into a pretrial agreement that did not require him to "waive all waivable motions" including one raised under Article 13, UCMJ. Moreover, even if Appellant had not been required under the terms of his deal to waive that motion, we believe that it is speculative that he would have prevailed on it, and if he did, that he would have received more than *de minimis* confinement credit as compared to his adjudged sentence. For these reasons, we find Appellant's ineffective assistance of counsel claim with regard to a potential Article 13, UCMJ motion to be without merit.

*3. Appellant fails to demonstrate that TDC labored under an actual conflict of interest in this case*

Appellant contends that his TDC labored under an actual conflict of interest in this case because he was contacted on Tinder by an undercover NCIS agent posing as a prostitute in the same manner as Appellant. Appellant further avers that TDC neither sought out the NCIS report containing his name or title nor informed Appellant of its existence. Appellant argues that rather than reveal to him the circumstances of his Tinder profile, TDC's interests were in preserving his professional reputation and avoiding embarrassment at being involved in an undercover investigation into commercial sex trafficking and prostitution. Appellant asserts that TDC's interests necessarily diverged from his own in uncovering evidence related to NCIS's conduct and investigation to the greatest extent possible.

However, Appellant is unable to establish that his and LCDR Bravo's interests diverged with respect to a material factual or legal issue. LCDR Bravo maintained a profile on Tinder, a legal online dating application. And alt-

---

[42] R. at 147.

hough an undercover NCIS agent posing as prostitute apparently reached out to him through Tinder, there is no evidence in the record, to include Appellant's post-trial declaration, that LCDR Bravo engaged in any illegal activity or that NCIS believed that he engaged in illegal activity in connection with their sex trafficking sting operation. There is also no evidence in the record, beyond speculation by Appellant in his post-trial declaration, that LCDR Bravo feared professional or reputational embarrassment because an undercover NCIS agent posing as a prostitute had reached out to him on Tinder. Finally, there is no evidence that LCDR Bravo—or his command—was even aware that an NCIS investigative report existed containing his name or title in conjunction with the sting operation. For these reasons, we find that LCDR Bravo did not operate under an actual conflict of interest in this case.[43] Therefore, Appellant does not benefit from a presumption of prejudice in connection with his claim of a conflict of interest between him and his TDC.

*4. Appellant fails to demonstrate prejudice due to the potential conflict of interest arising from an undercover NCIS agent contacting LCDR Bravo on Tinder*

Having found that there was no actual conflict of interest, we next look to see if Appellant establishes actual prejudice based on the circumstances of an undercover NCIS agent posing as a prostitute reaching out to his TDC on Tinder. Appellant asserts that because of this purported conflict of interest, LCDR Bravo failed to seek reports from other NCIS investigations resulting from the undercover operation that might have exposed a pattern of behavior supporting an entrapment defense. Further, Appellant argues that the communications LCDR Bravo had with the undercover agent may have formed a basis for LCDR Bravo to be a witness for the Defense. However, we find no merit in these arguments. All of Appellant's interactions with the undercover NCIS agents in this case were recorded, either through screenshots of his text messages with Jamie or through an audio / visual recording of his in-person meeting with C.A. Therefore, we find no relevance between an undercover NCIS agent's interactions with LCDR Bravo on Tinder to a possible entrapment defense in Appellant's case. Likewise, we discern no potentially relevant testimony that LCDR Bravo could offer in Appellant's case based on his prior experience being contacted by an NCIS undercover agent on Tinder. For these reasons, we find no prejudice due to the potential

---

[43] *See Hale*, 76 M.J. at 722.

conflict of interest that arose under these circumstances, and thus, deny any relief due to that potential conflict of interest.[44]

## C. Appellant's Sentence Is Not Inappropriately Severe

### 1. Standard of review and the law

We review sentence appropriateness de novo.[45] Each "court-martial is free to impose any [legal] sentence it considers fair and just."[46] Therefore, "[t]he military system must be prepared to accept some disparity . . . provided each military accused is sentenced as an individual."[47] In execution of this highly discretionary function, we are neither required to, nor precluded from, considering sentences in other cases, except when those cases are "closely related."[48] As a general rule "sentence appropriateness should be determined without reference to or comparison with the sentences received by other offenders."[49] Notably one narrow exception to this general principle of non-comparison exists as we are "required . . . 'to engage in sentence comparison with specific cases . . . in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'"[50] When requesting relief by way of this exception, an appellant's burden is twofold: the appellant must demonstrate "that any cited cases are 'closely related' to his or her case and that the resulting sentences are 'highly disparate.'"[51] If the appellant succeeds on both prongs, then the burden shifts to the government to "show that there is a rational basis for the disparity."[52]

For cases to be considered closely related, "the cases must involve offenses that are similar in both nature and seriousness or which arise from a com-

---

[44] *See Strickland*, 466 U.S. at 697.

[45] *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006).

[46] *United States v. Turner*, 14 C.M.A. 435, 437, 34 C.M.R. 215, 217 (C.M.A. 1964).

[47] *United States v. Durant*, 55 M.J. 258, 261 (C.A.A.F. 2001) (citations omitted).

[48] *United States v. Ballard*, 20 M.J. 282, 286 (C.M.A. 1985); *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001).

[49] *Ballard*, 20 M.J. at 283 (citations omitted).

[50] *Wacha*, 55 M.J. 266, 267 (citations omitted).

[51] *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999).

[52] *Id.*

mon scheme or design."[53] This threshold requirement can be satisfied by evidence of "co[-]actors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared . . . ."[54]

When assessing disparity among sentences, we look only to adjudged sentences, rather than those approved or bargained for in a pre or post-trial agreement: "[a]djudged sentences are used because there are several intervening and independent factors between trial and appeal—including discretionary grants of clemency and limits from pretrial agreements—that might properly create the disparity[.]"[55] Accordingly, we "generally refrain from second guessing or comparing a sentence that flows from a lawful pretrial agreement or a [convening authority's] lawful exercise of his authority to grant clemency to an appellant."[56]

We acknowledge disparity among sentences may arise from "differences in initial disposition rather than sentence uniformity."[57] However, "[m]ilitary commanders stationed at diverse locations throughout the world have broad discretion to decide whether a case should be disposed of through administrative, non-judicial, or court-martial channels."[58] Therefore, if "cases are closely related, yet result in widely disparate disposition, we must instead decide whether the disparity in disposition results from good and cogent reasons."[59]

Apart from the comparative analysis, we are nevertheless able to evaluate an appellant's sentence on its own facts as part of our required due diligence under Article 66(d), UCMJ. "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves."[60] This requires our "individualized consideration of the

---

[53] *United States v. Kelly*, 40 M.J. 558, 570 (N.M.C.M.R. 1994).

[54] *Lacy*, 50 M.J. at 288-89 (finding cases were closely related "where appellant and two other Marines engaged in the same course of conduct with the same victim in each other's presence").

[55] *United States v. Roach*, 69 M.J. 17, 21 (C.A.A.F. 2010).

[56] *United States v. Widak*, No. 201500309, 2016 CCA LEXIS 172, at *7, (N-M. Ct. Crim. App. Mar. 22, 2016) (unpublished) (per curiam) (citations omitted).

[57] *United States v. Noble*, 50 M.J. 293, 295 (C.A.A.F 1999).

[58] *Lacy*, 50 M.J. at 287 (citation omitted).

[59] *United States v. Moore*, No. 201100670, 2012 CCA LEXIS 693, at *4. (N-M. Ct. Crim. App. May 24, 2012) (unpublished) (*citing Kelly*, 40 M.J. at 570).

[60] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.'"[61] In making this assessment, we analyze the record as a whole.[62] Notwithstanding our significant discretion for determining appropriateness, we must remain mindful that we may not engage in acts of clemency.[63]

### 2. Appellant's case is not closely related to the other cases he identifies

Appellant argues that his case is closely related to those of Petty Officer First Class [PO1] (E-6) Fetterman,[64] Chief Logistics Specialist [LSC] (E-7) Halfacre, and Quartermaster Third Class [QM3] (E-4) Olaya, so as to trigger an analysis of whether his sentence is highly disparate to the sentence adjudged against these other Sailors. However, we find this argument to be unpersuasive.

At the time of his misconduct, PO1 Fetterman was stationed in Oklahoma and was running a prostitution ring with his wife, using women flown to the United States from Thailand.[65] After an investigation conducted by the Oklahoma City Police Department, in November 2018, PO1 Fetterman pleaded guilty in state court to multiple charges related to prostitution and received a deferred sentence to confinement under Oklahoma law.[66] Shortly after his sentencing, he was administratively separated from the Navy.[67] Because PO1 Fetterman's case was investigated by and prosecuted by state authorities in state court, we find that Appellant's case is not closely related to his case. Therefore, we do not look to see whether Appellant's sentence is highly disparate to the sentence in PO1 Fetterman's case.

---

[61] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (*quoting United States v. Mamaluy*, 10 C.M.A. 102, 27 C.M.R. 176, 180-81 (C.M.A. 1959)).

[62] *Healy*, 26 M.J. at 395.

[63] *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

[64] The previous military appellate defense counsel raised the issue that Appellant's case was "closely related" to PO1 Fetterman's case in Appellant's original assignment of error.

[65] Post-Trial Matters, encl. 1.

[66] *Id.*

[67] *Id.*

In the case of *United States v. LSC Calvin Halfacre*,[68] the appellant was charged with rape and patronizing prostitutes at a general court-martial. The allegations were that LSC Halfacre had, on separate occasions, patronized three different Thai prostitutes and anally raped each, while he was stationed in Bahrain. Ultimately, LSC Halfacre entered into a pretrial agreement with the convening authority in which he pleaded guilty to the three specifications of patronizing a prostitute, but not guilty to the rape specifications.[69] The maximum confinement based on LSC Halfacre's pleas of guilty was three years. The military judge sentenced LSC Halfacre to thirty months confinement and a dishonorable discharge. In contrast, Appellant was convicted of sex and labor trafficking, faced a maximum punishment of confinement for life, and was sentenced by the military judge to four years confinement and a dishonorable discharge. Based on the different offenses for which each chief petty officer was found guilty and the vastly different punitive exposure that each faced, we likewise find that Appellant's and LSC Halfacre's cases are not closely related. Therefore, we do not look to see whether Appellant's sentence is highly disparate to the sentence in LSC Halfacre's case.

In the case of *United States v. QM3 Kenneth Olaya*,[70] the appellant was convicted, contrary to his pleas, of attempted child sex trafficking, patronizing prostitutes, and attempted sexual assault of a child. He was sentenced by members to confinement for fifteen months, reduction to paygrade E-1, total forfeitures, and a dishonorable discharge. While stationed in Bahrain, QM3 Olaya agreed with an undercover NCIS agent to have sex with a Thai adolescent female, who was being trafficked to Bahrain and who was one day short of her sixteenth birthday. He also agreed, thereafter, to house her while she worked as a prostitute. In contrast, Appellant agreed to house three Thai women who were being trafficked to Bahrain for prostitution, and also have them clean his house (constituting labor trafficking). Appellant and QM3 Olaya would each receive a share of the money the prostitute(s) he housed earned and each would be able to have sex with the prostitute(s) whenever he wished. Although his fictional victim's age is

---

[68] *United States v. Halfacre*, __ M.J. __, No. 201900210, 2020 CCA LEXIS 431 (N-M. Ct. Crim. App. 2020).

[69] The Government did not go forward on the rape specifications, which were dismissed in accordance with the pretrial agreement.

[70] *United States v. Olaya*, No. 201900211, 2020 CCA LEXIS 413 (N-M. Ct. Crim. App. Nov. 16, 2020) (unpublished).

certainly an aggravating factor in QM3 Olaya's case, the sex / labor trafficking enterprise Appellant attempted to engage in would have victimized three human beings as opposed to one. Consequentially, we find that Appellant's and QM3 Olaya's cases are not closely related. Therefore, we do not look to see whether Appellant's sentence is highly disparate to the sentence in QM3 Olaya's case.

### 3. Appellant's sentence was not inappropriately severe

Although Appellant served over seventeen years of honorable service, and had child support obligations that led him to consider ways to earn extra money, he voluntarily entered into a scheme that he believed would entail him housing and holding onto the passports of three Thai women, having them clean his apartment, profiting from their wages as prostitutes, and having sex with them whenever he wished. These are very serious offenses, as reflected by the fact that Congress established life imprisonment as the maximum punishment for them. Moreover, Appellant entered into a pretrial agreement that suspended adjudged confinement in excess of five years, and then he "beat the deal" by receiving a sentence with a confinement component of four years.

Ultimately, we find the adjudged sentence appropriate. Weighing the gravity and circumstances of Appellant's misconduct against his record of service and the other evidence in extenuation and mitigation, we are convinced that justice was done and Appellant received the punishment he deserves.[71]

## III. CONCLUSION

After careful consideration of the entire record of trial, and the briefs from both parties, we have determined the approved findings and sentence are correct in law and fact and find no error materially prejudicial to Appellant's substantial rights occurred.[72] The findings and sentence as approved by the convening authority are **AFFIRMED.**

Senior Judge STEPHENS and Judge DEERWESTER concur.

---

[71] *See Healy*, 26 M.J. at 395.

[72] UCMJ arts. 59, 66.



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court